## CHARLOTTE UNION BUS STATION, Inc.
### v.
## COMMISSIONER OF INTERNAL REVENUE.
### No. 6684.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 19, 1953.
Decided Jan. 4, 1954.

Shearon Harris, Charlotte, N. C., for petitioner.

Joseph F. Goetten, Sp. Asst. to the Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack and Lee A. Jackson, Sp. Assts. to the Atty. Gen., on brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is a petition to review a decision of the Tax Court affirming assessment of income and excess profits taxes against the Charlotte Union Bus Station, Inc., for the taxable years ending July 31, 1945, 1946 and 1947. See 19 T.C. 336. Taxpayer is a corporation owning a bus terminal building in Charlotte, N. C. It was organized by three of the principal bus companies using its facilities. These owned all of its capital stock and entered into a written agreement with it that the terminal should be operated without profit and that the expenses of operation in excess of the amounts received from other bus companies and tenants should be billed to and paid by them on a monthly basis. Subsequently, collections were made from them on the basis of a percentage of ticket sales and a surplus was accumulated as a result thereof. Still later collections were made in the amount necessary to pay expenses and maintain the surplus. The Commissioner assessed the deficiencies on the basis of the written agreement as he interpreted it and as modified by a subsequent written agreement, without reference to the actual receipts by taxpayer and without regard to changes in the method of doing business which had taken place pursuant to agreements between the parties. The Tax Court affirmed the assessment, holding that the agreement was one required to be in writing by the statute of frauds and that no modification thereof not complying with that statute would be recognized in the computation of the taxable income of the corporation.

The facts are that the carrier stockholders of the terminal taxpayer had for some years prior to 1940 been operating a bus terminal on a nonprofit basis in a rented building in the City of Charlotte. In 1940 they arranged to purchase a lot and erect a terminal building thereon with borrowed money secured by mortgages on the property. The agreement was that the terminal should be operated on a nonprofit basis and on November 26, 1940 they entered into a written agreement to that effect providing that, after applying against expenses, receipts from other bus companies and other tenants of the building, the remainder of the expenses of operation should be billed to the stockholding carriers and paid by them, together with the amount necessary to make interest and amortization payments on the mortgages on the terminal building. With respect to two of the items in dispute in this case, depreciation and income tax, the written agreement provided that the carrier stockholders should be billed for depreciation but there was no such provision with respect to income tax, although there was express provision that they be billed for other taxes. The explanation is made in the testimony that no provision was made for income tax because it was thought that, as the terminal was to be operated on a nonprofit basis, there would be no income subject to taxation. The pertinent paragraphs of the written agreement setting forth the items for which the carrier stockholders were to be billed are as follows:

"(e) A statement of the total expenses of the Terminal Company

during said month, including the following:

"(1) All items of expenses of the Terminal Company for the operation of its terminal facilities, including taxes on furniture, fixtures and equipment, maintenance, insurance, renewals, rentals and depreciation, as well as all repairs and extraordinary operating expense, or expenses growing out of operation of the terminal which may be necessary.

"(2) One-twelfth of the taxes due the City of Charlotte and Mecklenburg County annually on said terminal facilities and the real estate upon which the same is situate."

It was provided by the written agreement that statements showing the amount to be paid by the stockholding carriers should be sent to them on or before the fifth day of each month and that they should make remittance therefor by the fifteenth of the month; but this procedure was never followed. The manager of the terminal was instructed by the stockholding carriers to retain a charge of 10% on their ticket sales and to use the amount thus derived to defray expenses of operation remaining after crediting the amounts received from other carriers and other tenants of the building. This was done until sometime in 1944 when a surplus of around $20,000 had been accumulated. The terminal manager was then instructed to discontinue the 10% charge on ticket receipts and bill the stockholding carriers monthly for amounts necessary to maintain the surplus of $20,000 and pay the balance of operating expenses after applying the amounts received from other carriers and tenants. Subsequently the surplus required to be maintained was reduced to $10,000.

As above stated, it was not contemplated that liability for income taxes would arise as a result of the operation of the terminal, the fact evidently being overlooked that such liability would arise if the amounts necessary to make payments on the mortgages were received as income rather than as contributions to capital. Liability for taxes for the years 1942 and 1943 was shown by the returns made for those years and the directors of taxpayer authorized that they be paid and they were paid out of cash on hand. The return for the taxable year ending July 31, 1944 showed no taxable net income, but in March 1945 a deficiency in income and excess profits taxes in the sum of $45,150.16 was assessed against taxpayer for the year 1944. Before this deficiency assessment was made the directors of taxpayer, who were the directing heads of the stockholding carriers, had been giving consideration to how taxpayer should meet the assessment which they had been advised would probably be made, and had agreed that it should be financed by a loan to be made to taxpayer by the stockholding carriers.[1] A written agreement was entered into between the taxpayer and these carriers on June 14, 1945 providing that loans should be made to the taxpayer by the carriers to pay all federal and state income taxes; and loans were duly made pursuant to this agreement from which the deficiency assessment was paid. Subsequently, the remaining cash surplus derived by taxpayer from the percentage charge on ticket sales was refunded to the companies from which it had been collected and a like amount was paid in by the companies in somewhat different proportions as a contribution to capital. The written agreement of June 14 provided that, upon the discharge of the mortgage indebtedness of taxpayer, the stockholding carriers should cancel the indebtedness resulting from loans for payment of

---

[1]. Whether the taxes should be billed to the stockholding carriers as a part of the rental for which they were liable or should be financed by loans which would eventually become contributions to capital, was of little practical importance except in avoiding the pyramiding of taxes on taxes, since the taxes which taxpayer would escape by the loan method would be borne by the stockholding carriers, who would not be entitled to a tax deduction on account of loans or capital contributions but would be entitled to deduction for amounts paid as rental.

taxes and treat same as a contribution to capital account.

The Commissioner in assessing the deficiencies for the tax years 1945, 1946 and 1947 proceeded on the theory that taxes should be assessed on the basis of what the taxpayer was entitled to receive under the written contract of November 26, 1940, as modified by the written agreement of June 14, 1945, without reference to the changes which had been made in the operation of the terminal under other agreements of the parties which had not been embodied in formal written instruments and without reference to taxpayer's actual receipts and expenditures. He concluded that net income for the years in question consisted of payments on mortgages, capital expenditures and the tax deficiencies in federal and state income tax assessed for the taxable year 1944. The Tax Court sustained the deficiency assessments made by the Commissioner for the tax years in question holding that, as taxpayer was on the accrual basis, its income should be computed with respect to income that it should have received as well as with respect to income received, and that it should have received the items accepted by the Commissioner as the basis of the assessments. The Tax Court held also that the written contract related to matters required to be in writing by the North Carolina statute of frauds, that no modifications of the contract were valid unless complying with that statute and that no modifications had been established prior to the contract of June 14, 1945 even if the requirements of the statute of frauds were disregarded.

We think that the decision of the Tax Court with respect to these matters was clearly erroneous. Modifications of the contract, which required monthly billing of the carrier stockholders for expenses not collected from other carriers and tenants, and the substitution therefor of the retention of a percentage of ticket sales were clearly established, as was the subsequent monthly billing of the carriers to maintain operating surplus; and these modifications were not nullified by the statute of frauds. Apart from the fact that they were evidenced by writings and were actually executed in the operation of the business, it is elementary that only the parties to a contract may invoke the statute of frauds with respect thereto. 49 Am.Jur. p. 896, 897; note 21 Ann.Cas. 1388, 1390; Roberts v. American Alliance Ins. Co., 212 N.C. 1, 192 S.E. 873, 113 A.L.R. 310; Cowell v. Phoenix Ins. Co., 126 N.C. 684, 36 S.E. 184. The government must assess taxes upon income which the taxpayer has received or which he has a fixed right to receive under existing contracts. Spring City Foundry Co. v. Com'r, 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200. There is no basis in law or in reason for permitting the government, in order to tax nonexistent income, to invoke the statute of frauds and repudiate, on the basis of the statute, contracts which a taxpayer has made in good faith and under which he has surrendered the right to receive the income which it is proposed to tax.

With respect to the principle item for which the deficiency was assessed, i. e. the deficiency assessments of income tax for the taxable year 1944, we think it clear that this item was not properly accrued as income for the taxable year 1945, even if we look solely to the provisions of the written contract of November 26, 1940; for there is nothing in that contract which requires the carrier stockholders to pay either federal or state income taxes. On the contrary, no provision was made for the payment of such taxes because it was thought that, since the terminal would be operated on a nonprofit basis, the necessity for paying such taxes would not arise. The provisions of the contract quoted above made express provision for payment of taxes due the City of Charlotte and Mecklenburg County upon the terminal facilities and real estate; and the principle expressio unius est exclusio alterius is applicable. We think it perfectly clear that taxpayer

**590**

could not have recovered under the contract against the carrier stockholders for income taxes paid; and, this being true, there is no basis for accruing such taxes as an item of income which taxpayer should have collected. The fact that income taxes in comparatively small amounts were paid for the years 1942 and 1943 from cash on hand is no argument to the contrary. These taxes were, of course, liabilities of taxpayer and were properly ordered paid from any funds on hand. This certainly had no tendency to establish the liability of the carrier stockholders to pay such taxes.

■ As stated above, however, we think it clear that the contract of November 26, 1940, which authorized the monthly billing and payment of expenses, was superseded by the agreement for the retention of a percentage of ticket sales and the subsequent agreements as to monthly billing for expenses in excess of collections to maintain a surplus. Nothing in any of these agreements would justify the accrual of the deficiency assessments for the year 1944 as income of the taxpayer. There was no agreement that taxpayer should be reimbursed by the carrier stockholders for these expenditures, which were not anticipated, and there was no provision for taking care of them until the loan agreement was made under which the money was advanced to pay them. It is only where the right to receive a definite and exact amount becomes fixed that the right accrues and may be treated as income even though taxpayer is on the accrual basis. Spring City Foundry Co. v. Com'r, supra; Clifton Mfg. Co. v. Com'r, 4 Cir., 137 F.2d 290, 150 A.L.R. 749; Helvering v. McGlue's Estate, 4 Cir., 119 F.2d 167; Franklin County Distilling Co. v. Com'r, 6 Cir., 125 F.2d 800.

■ The government admits that there was error with respect to the item of depreciation included in the income upon which the deficiency assessments were based. Taxpayer contends that all mortgage payments and capital expenditures during these years were derived from two sources: (1) current income as properly reported in the respective tax reports for these years and, (2) funds which had already been accounted for and taxed as income of the taxpayer. This, however, involves matters of accounting as to which the facts should be found by the Tax Court before we attempt to pass upon them.

For the reasons stated, the decision of the Tax Court will be reversed and the case will be remanded for further proceedings not inconsistent herewith.

Reversed and remanded.