**UNITED STATES of America,**
**Appellant,**

v.

**Gordon P. HAYNES and Essie M.**
**Haynes, Appellees.**

**No. 15655.**

United States Court of Appeals
Fifth Circuit.
April 20, 1956.

Harlan Pomeroy, Trial Atty., Dept. of Justice, Washington, D. C., James W. Dorsey, U. S. Atty., Slaton Clemmons, Asst. U. S. Atty., Atlanta, Ga., Charles K. Rice, Asst. Atty. Gen., Charles D. Read, Jr., Asst. U. S. Attys., Atlanta, Ga., H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., for appellant.

John H. Hudson, William Ralph Hudson, Atlanta, Ga., Thomas E. Berry, Houston, Tex., for appellees.

Before BORAH, TUTTLE and BROWN, Circuit Judges.

TUTTLE, Circuit Judge.

This appeal from a judgment of the district court in favor of the taxpayer raises the question whether payments made by his employer during sick leave, under the employer's disability benefit plan, are exempt from taxation under the provision of Section 22(b) (5) of the Internal Revenue Code of 1939, which exempts "amounts received through * * * health insurance * * * as compensation for * * * sickness".[1]

Taxes are a creature of statute. It is thus the duty of the Court to look to the statute and if the incidence which makes the tax applicable exists, then the tax follows perforce; but if it does not exist, then it is not within the province of the Commissioner of Internal Revenue, by regulations, or the Courts, by judicial legislation, to bring something within the ambit of a tax that Congress has not placed there. This rule must, of course, work both ways. In devising a scheme of taxation Congress may well discern an area of limited dimensions in which it considers that special relief is indicated. It may then determine that carving out a special exemption will not cut so deeply into anticipated revenues as to cause the favoring of the limited class to bear too heavily on the great bulk of the taxpayers. Congress must then be able to enact a statutory exemption for such limited area with its restricted revenue loss with the assurance that such exemption will not be broadened by judicial fiat into something covering a much larger area and involving manifold greater revenue loss.

Here Congress provided an exemption from gross income of "amounts received * * * through * * * health insurance * * * as compensation for * * * sickness." The taxpayer seeks to have included in such exemption amounts paid to the employe by the employer which in fact comes to him as a continuation of his regular salary during sick leave.

Both parties, in their briefs, discussed at length the particular terms of the voluntary plan put into effect by the employer, the Southern Bell Telephone & Telegraph Company, under which it provided pay benefits to sick or injured em-

1. The applicable statute is as follows:
   Internal Revenue Code of 1939:
   "§ 22. Gross income
   * * * * *
   "(b) [as amended by Secs. 113 and 127(d), Revenue Act of 1942, c. 619, 56 Stat. 798] Exclusions from gross income. The following items shall not be included in gross income and shall be exempt from taxation under this chapter:
   * * * * *
   "(5) Compensation for injuries or sickness. Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 23(x) in any prior taxable year, amounts received through accident or health insurance or under workmen's compensation acts, as compensation for personal injuries or sickness, plus the amount of any damages received whether by suit or agreement on account of such injuries or sickness, and amounts received as a pension, annuity, or similar allowance for personal injuries or sickness resulting from active service in the armed forces of any country; * * *."
   26 U.S.C.A. § 22.

ployes on a sliding scale, varying from full pay for four weeks, and half pay thereafter for nine weeks for an employe with from 2 to 5 years' service, up to full pay for a year for an employe, such as taxpayer, with 25 years or more. We think the details of the plan are relatively unimportant, since it cannot be disputed that there is no separate contract or agreement of insurance covering an obligation to pay any amounts to the company's employees. We think it clear that when Congress limited the exempt payments to "amounts received through * * * health insurance" it had a concept, clearly stated, of amounts the payment of which was definitely and with binding force fixed by an insurance contract between the employe and an insurer or between the employer and an insurer for the specific benefit of the employe.

■ In the trial court there was evidence to the effect that sickness and health insurance was not ordinarily written for full salary amounts; that the employer here did not make payments on an actuarial basis in relation to the amount of risk or to any other factor of age, state of health, or anything else; that no reserves were set up as is ordinarily done in the case of insurance, and that benefits were voluntarily fixed by a management committee. The importance of this evidence is not to prove that the company's plan here was unlike insurance, but it was relevant and of great weight to the proposition that when Congress exempted only such amounts as come "through health insurance," it had a clearly defined class in mind, and that this class is readily identified by normally having a bundle of attributes or characteristics associated with the term "insurance." This class of persons whose payments were exempt were those who, for a definite consideration, having an actuarial relation to the benefits provided, paid by them or on their behalf, obtained insurance coverage under ordinary insurance standards. There was thus an ascertainable amount of gross income involved, from which an estimate of loss of revenue to the government could be made. This loss would obviously be quite different from the loss that would result if the class designated by Congress was made to include every employe who received payments of salary or wages by the voluntary action of his employer during sick leave.

Our reference to the loss of revenue is not intended to suggest that such loss has any part in enabling the Court to construe a tax statute. The government makes no such argument here and we would not consider it if made. The reference to the differing impacts upon the revenue is cited to indicate that Congress, in adopting an overall scheme of taxation in which the revenue loss of each exemption plays an important part, must choose words of description to set apart those taxpayers or payments within the exemption. In this case the term "through insurance" was the terminology adopted by Congress for this purpose.

■ We think it clear, without resort to any but the fundamental rule that words are ordinarily to be taken to mean what they usually import to the average person, that Congress meant to give the exemption here only to amounts received through insurance. If it had intended that all payments received as compensation for sickness were to be exempt it would, of course, not have used the words "through insurance" at all. They would clearly have been superfluous and misleading if that had been the intent of the lawmakers.

Appellee here relies on the decision of the Court of Appeals for the Seventh Circuit in Epmeier v. United States, 7 Cir., 199 F.2d 508, 511, by which case the trial court doubtless felt bound. Although there are present in the Epmeier case facts that might warrant our distinguishing it from the case before us, we think that even those facts are unimportant in construing the statute here before us. In Epmeier the employe was working for an insurance company, a company which had the authority to is-

sue health insurance, although no health insurance had actually been issued by it to cover the payments involved in that litigation. The nature of the employer's business was stressed by the Court, but it also construed the purpose of the statute as "to relieve a taxpayer who has the misfortune to become ill or injured, of the necessity of paying income tax upon insurance benefits received to combat the ravages of disease or accident."

With deference to the views of that distinguished Court, we are of the opinion that the purpose of the statute was to exempt from income tax the proceeds of insurance which had been bought and paid for by the payment of premiums consciously and knowingly made for "health inurance." Whatever the activating motive of Congress may have been in passing the law, its intent was clear that the exemption was to apply only to payments received through insurance. The payments made to the taxpayer here by the Southern Bell Telephone & Telegraph Company during his absence on sick leave were not such payments. They had no relation to health insurance. See Moholy v. United States, D.C.N.D.Cal., 132 F.Supp. 32, pending on appeal C.A.9; Branham v. United States, D.C.Ky., 136 F.Supp. 342; and Herbkersman v. United States, D.C.S.D. Ohio, 133 F.Supp. 495, pending on appeal C.A.6. These cases deal with similar questions, the first two having been decided by the district court in favor of the government, the third in favor of the taxpayer.

The judgment of the trial court erroneously construed the exemption statute as covering payments which were not, in fact, received through health insurance. It must be reversed and judgment rendered for the appellant.

Reversed and rendered.

BROWN, Circuit Judge (dissenting).

Admonished as we are, and almost invariably at the behest of the Tax Collector that "Questions of taxation must be determined by viewing what was actually done * * * and when applying the provisions of the Sixteenth Amendment and income laws enacted thereunder we must regard matters of substance and not mere form * * *", Weiss v. Stearn, 265 U.S. 242, 44 S.Ct. 490, 492, 68 L.Ed. 1001; "* * * The incidence of taxation depends upon the substance of a transaction * * *," Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S. Ct. 707, 708, 89 L.Ed. 981, the result here is difficult to comprehend. For it is the triumph of form over substance. Form is the absolute monarch here not only in requiring $a$ contract, but in specifying the type of contract, the nature of the considerations which business men must have applied, and the specific guaranties required.

To be more specific, in the Court's eye, it must be a contract of insurance, named as such, issued by one having unquestioned legal authority to underwrite, calling for the payment of premiums and specifying ascertainable, legally enforceable obligations. The Court states it several ways, but it always adds up the same:

"We think the details of the plan are relatively unimportant, since it cannot be disputed that there is no separate contract or agreement of insurance covering an obligation to pay any amounts to the company's employees. * * *"

And, again, the Congressional concept of the phrase "amounts received through health insurance" is stated to be, "amounts the payment of which was definitely and with binding force fixed by an insurance contract between the employe and an insurer or between the employer and an insurer for the specific benefit of the employe. * * *" The Congressional concept of the type of contract is expanded then into a concept as to the class of persons affected. But as to the class and as to the type, it is the paper which counts: "This class of persons whose payments were exempt were those who, for a definite consideration, having an actuarial relation to the benefits provided, paid by them or on their behalf,

obtained insurance coverage under ordinary insurance standards. * * * "

I can find no basis for these conclusions either in the inquiry concerning the intent and purpose of Congress as it acted in its dual capacity of creator and defender of the public Treasure, or in the analysis of the factors underlying the nature of insurance. On this latter phase I feel that the Government's contention, essentially adopted by the Court, suffers from two underlying defects: first, it is not for the Government to decide what free men ought to consider a fair bargain, and second, the record and contention that this arrangement lacks the qualities of insurance evidences a surprising lack of understanding of the nature of modern insurance.

As to the Congressional motivation, I accept, of course, the Court's statement that it is not entering into the field of legislative wisdom. I do not for a moment think that the Court bases its conclusion upon the prospective loss of revenue. This supposed concern of Congress is, however, put forward as a likely or probable explanation for the use of the terminology "through insurance." I am unable either to see any basis for the argument or where it gets us.

I do not know how Congress, in 1939, could keep its legislative grace "within bounds" for succeeding years by knowing then the extent to which health and accident insurance had become a part of the contemporary social-economic life. Perhaps there is the thought that the situation was automatically, albeit somewhat unconsciously and certainly informally, reviewed from session to session as Congress met, impliedly reapproved the 1939 concept, and then adjourned without amendment. But, finally, since Congress in 1939 could not possibly know the amounts which would be paid in 1949 either as insurance under contracts of insurance or as benefits under employer plans, I hardly see how the proper legislative concern with impact on probable revenues aids us at all.

When it comes to the analysis of the Telephone Company's arrangement here,

I must confess that I am confused as to just what the Court does with it. After detailing briefly the supposed deficiencies as an insurance contract, the Court first states, "The importance of this evidence is not to prove that the company's plan here was unlike insurance * * *." But while disavowing such purpose, apparently out of regard to the view this Court has always taken that it is not for Government to intrude itself upon the reasonableness of business agreements made between free men, it arrives at the same result, for instead of saying that the arrangement was "unlike insurance," it merely holds that the beneficiaries of this plan are not within the *class* of persons who have rights under an insurance contract; for the Court says, " * * * but it was relevant and of great weight to the proposition that when Congress exempted only such amounts as come 'through health insurance', it had a clearly defined class in mind, and that this class is readily identified by normally having a bundle of attributes or characteristics associated with the term 'insurance.' "

I would think that if the plan was sufficiently "like" insurance as to be "insurance" then the beneficiaries of the plan would be within the class of persons covered by "insurance." In this respect it seems to be another argument advanced as proof but then withdrawn.

If so, then premise and conclusion stand alike in terms: Congress said "amounts received through accident or health insurance"; therefore, Congress meant payments made under health insurance contracts.

But the exact mechanism of the Court's process of reasoning is not, in my judgment, significant because, basically, the attack made by the Government, sustained by the Court, that because of certain supposed deficiencies the arrangement lacks the *quality* of an insurance contract simply will not bear analysis.

There is, first, no magic about an insurance contract. Like any other, it is merely an agreement to pay ascertain-

able sums upon the happening of indicated contingencies in return for the payment of some consideration. Where the question is whether a person assuming the obligations of an insurer is engaged, or may engage, in the insurance business, as such, the problem may become more complex in determining whether such person has complied with the common and numerous statutory requirements regulating that particular business. But here the question is not whether Southern Bell Telephone and Telegraph Company may engage in the general insurance business. The question is: have they made a contract of insurance. If a contract of insurance has been made between the Telephone Company and its employees, it is not open to the Government to challenge its validity on some supposed corporate infirmity or the like. Charlotte Union Bus Station, Inc., v. Commissioner, 4 Cir., 209 F.2d 586; Francis M. Camp, 21 B.T.A. 962; J. N. Wheelock v. Commissioner, 16 T.C. 1435. The elements of an insurance contract are few and simple.[1] The nature of the contract, the agreement to insure, is not determined by its form or the label affixed to it; it is judged on substance.[2]

But the Court, obsessed with its conviction that the contract of insurance must be in a particular form issued by a particular company, waves all of this to one side because, "the details of the plan are relatively unimportant". The synoptic analysis set forth in Appendix I amply demonstrates that this arrangement satisfied the requirements of a contract[3] of insurance.

The attack on the plan for its intrinsic deficiencies from an insurance standpoint fares no better.

At the outset this should be recognized for what it is: it is the intrusion again of the Commissioner into the business affairs of citizens. He has the right, of course, to impose and collect the taxes incident to the performance of the contract. But he does not have the right to say what contract shall be made nor what consideration shall be followed, nor what may be considered a good bargain. He cannot do this directly, nor can he do it by the favorite ad-

---

1. 44 C.J.S., Insurance, § 1, p. 471:
   "[*Definition.*] Fundamentally it is an agreement to pay a sum on the happening of an event, and has been said to be best defined as a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from an unknown or contingent event. More broadly, however, the term 'insurance,' or 'insurance contract,' or 'insurance policy,' in the sense of the subject matter with which it deals, denotes a contract by which one party, for a compensation called the 'premium,' assumes particular risks of the other party and promises to pay to him or his nominee a certain or ascertainable sum of money on a specified contingency * * *."

   See also Id., § 12, Disability Insurance, page 477 and § 18, Health Insurance, page 480.

2. 29 American Jurisprudence, Insurance, § 4: "The name by which a company * * *, or its certificates or policies, are designated is not determinative of the question whether * * * its contracts are in the nature of insurance policies * * *. The nature of a contract as one of insurance depends upon its contents and the true character of the contract actually entered into or issued— that is to say, whether a contract is one of insurance is to be determined by a consideration of the real character of the promise or of the act to be performed, and by a consideration of the exact nature of the agreement in the light of the occurrence, contingency, or circumstances under which the performance becomes requisite * * *."

   The form is so unimportant that the contract to insure may be oral. 29 American Jurisprudence, Insurance, §§ 127, 129 and, generally, § 126.

3. Appendix I is taken verbatim from Taxpayer's brief and illustrates well how material may be effectively presented with graphic force and convenience to the Court.

   Undoubtedly impressed by this technique the brief of Robert K. Jewett and Thomas E. Berry, Esqs., *amici curiae*, following a similar format, contains a tabular comparison of the Haynes, Epmeier and Herbkersman cases and is included as Appendix II.

ministrative device of the oblique approach in which, it is urged, the transaction as the Taxpayer says it occurred, could not have occurred because such a course would have been unreasonable.

But granting the Commissioner the right to supervise contracts, to assay them from the standpoint of inherent business reasonableness or unreasonableness, to give him an over-the-shoulder gentle guidance to business transactions, his objections here are quite inadequate.

It is contended that since the plan calls for the payment of the full weekly salary for the stated periods, there is no incentive upon the part of the employee to return to work, and this stands in contrast to the ordinary commercial policy limiting weekly indemnity to 75 to 80%.[4] Likewise, it is said that since the Company, in its intracompany accounting, charged payments under the disability plan to operating expense; carried them as one of the specified items under the general category of salaries and wages rather than as plan benefits similar to the way they did for payments into the pension fund; maintained no special reserve account; payments were based on salary only not on some actuarial standards; benefits were available to all employees without a specific medical examination; and the company was not obliged to pay premiums over and above the cost of the actual weekly benefits paid kept this from being insurance. Similarly, complaint is made that the administration of the plan is finally in the hands of Company executives whose decision is stated to be final. This proves, it is claimed, that the plan is a gratuitous arrangement only with no contractual obligations and which is further borne out by the fact that no suit has ever been filed under it.

But all of these contentions ignore the real nature of the insurance business.

One thing stands out in the long history of the development of insurance: it came into being out of the business necessity of hedging and protecting against contingent hazards. It is the business man then who determines in the first instance what is needed and the nature and extent of the protection sought. The underwriter lays down the terms most generally by adjusting the cost of the insurance upwards or downwards. In this way underwriters will literally insure anything. If a business, therefore, such as the Telephone Company, determined, as it in its judgment saw fit, that good business called for an insurance policy awarding weekly benefits equivalent to this plan, it is certain that it could, and would, be quickly underwritten. The fact that the required insurance called for the payment of 100% of the employees' salary instead of 75 to 80% would, if material at all, be adjusted in the rate. The same would be true concerning the supposed moral risk as payment of the equivalent of full weekly wage is thought to destroy the incentive to return to work. The element cannot be a big one because for the first five years of employment, the full wage benefit is payable only for four weeks and, on a graduated scale, it finally works up to a maximum of fifty-two weeks after twenty-five years. An underwriter might well consider that the personnel standards of the insured company were such as to likely attract and hold conscientious people of high moral responsibility who would not be beguiled into malingering by the lure of these limited payments. The underwriter would undoubtedly take into account also the counter incentive to remain on the job to assure advancement in pay and position with its cumulative effect of increasing future disability benefits and pension and retirement advantages.

4. Just what is the source of the statements made by the Government concerning the insurance business is quite obscure. Certainly not in this record comprising as it does only the vaguest of words from a local, general agent for one private health and accident company whose testimony, on the whole, shows that he neither posed as an industry-wide expert, nor was he attempting to state the variable conditions upon which underwriters would be bound.

Moreover, this whole argument ignores the widespread postwar development in the field of health and accident insurance in which reliable companies are offering a variety of packaged benefits designed to help the breadwinner over periods of disability from accident or disease.

Health and accident insurance is not normally written upon a prior health examination and even the so-called expert conceded this. Nor is there any basis in the industry for the Government's contention that payments are based upon some actuarial standard. On the contrary, they invariably call for the payment of fixed weekly indemnities.

The premium cost might, in commercial insurance companies, be determined on a so-called actuarial basis, but no underwriter could hope to have a better experience upon which to calculate his premium than that of the Southern Bell. Telphone Company whose plan has been in operation since 1913. This leads to the very curious argument that it cannot be insurance because it only costs the Telephone Company what it pays out, and if it were insurance, they would either pay less or pay more. We have progressed far beyond the naive idea that loss is not sustained merely because it is insured. Business knows now that ultimately it bears its own losses, so that insurance is more and more a catastrophe-stop loss and an efficient claims adjusting service. So, while for one year or so, the premium cost to the Telephone Company might be much less than the total payments made to employees, it would not be long until there was a reliable ratio between known probable income and outgo. One of the interesting manifestations of the new business point of view toward the real loss is the growth of retrospective rating plans of one kind or another. In this system the ultimate premium paid is dependent upon the particular assured's own loss experience. There are infinite variations in these plans, but in the main they call for the payment of a premium equivalent to losses plus an added arbitrary percentage for claims handling and overhead with or without, at added cost, catastrophe-stop losses. It then becomes a matter of pure business judgment whether any real purpose is to be served by the entry of an insurance company and its policy. Frequently, this is required by external statutory provisions, such as Workmen's Compensation, Motortruck Carrier, Cargo and Public Liability Insurance, Compulsory Automobile Insurance, or the like. But where external conditions do not require the entry of an insurance company, it is but an ordinary business problem to determine the probable cost by self-insurance as opposed to outside insurance.

This leads naturally to another demonstration that the requirement of an insurance company contract is artificial indeed. Whatever the corporate power under Georgia Law of the Telephone Company to write insurance, it could easily have organized its own health and accident insurance affiliate. The Company would not have to worry about losses, reserves, or the like because whatever the subsidiary paid out, it would know that, it would have paid the same to the employees under the plan. Likewise, being a part of a large family of integrated Telephone Companies, it could easily have organized with other company members of AT&T a mutual insurance company or a Reciprocal Exchange. The essence of each is that the insured is also insurer. Since the exposures would be consistent and uniform, the losses ultimately would fall substantially on each participating member company. The cost then would be what it has always been.

Of course, it is a little absurd to elaborate on what must be such an obvious economic fact: if experience over the years by Southern Bell Telephone Company shows the payment of stated sums as plan benefits, it is obvious that the cost through insurance policies would have to be at least as much and likely more. There is nothing in Section 22(b) (5) to require that an employer discard his own business judgment in apprais-

ing the alternative means of giving employees health and accident insurance benefits. Large companies frequently self-insure property and liability exposures of millions of dollars. Unless the Commissioner has the right to veto it, there is no reason why the same policy cannot be followed on a health disability plan whose risks, it must seem obvious, are slight. The criticism that there are no reserves as such, or that the plan is administered by Company executives is likewise superficial. Of course, it is the Commissioner again trying to tell the employee that the security of his "insurance" contract is no good because there is not a special reserve posted or the management may be prejudiced. But disregarding this, there is no showing that ample funds are not available or that security would better be assured by frozen funds. If one were required, the Commissioner would likely again enter the picture to determine the nature and kind of investments and perhaps might criticize an investment by the Telephone Company in its own or affiliates' stocks even though our Government follows somewhat the same practice with Social Security revenues.

That there has not been a suit for 30 years over the plan does not prove it lacks legal enforceability. And, again, just what kind of a contract would satisfy the Commissioner? Suppose the employee belongs to a Fraternal lodge which issues a policy or a certificate? Suppose, as is quite common, it is his labor union that provides a specific benefit against specific premium contributions? Is it any less "amounts received through * * * insurance" if, as is so common, the bylaws of the lodge or union vest absolute power in the officers and presumably prohibit claim or suit? Nor is there any assurance that courts would not protect these beneficiaries if, under the terms of the plan, certain weekly benefits had accrued by prior service but were arbitrarily denied by the Telephone Company.

I have discussed these contentions in some detail because I think it important that in this situation it is imperative that substance be the rule of reason.

This plan has all of the attributes of insurance. It is not necessary to satisfy the statute that the plan adhere to the underwriting principles of any one particular health and accident insurer. Viewed from the standpoint of its reasonableness as an insurable undertaking, the plan is one which would find great acceptance at a premium cost which could soon be calculated. Since it is the Telephone Company's money which will be spent in either case, it has determined in its wisdom that it is better as a business proposition for them to bear the direct and full costs of this, rather than resort to an external third party. By this means, the Telephone Company is able to transfer from the shoulders of its employees the risks of loss of essential income during periods of illness or injury. The employees have paid a valuable consideration for the risk which the employer has taken on. Their "premium" payment has been made through the services performed for the Company under the employment contract which includes, as a part, this plan.

The statute requires, of course, *insurance* payments. I would certainly agree that mere generosity on the part of an employer in continuing wages would not qualify. But where the employer's plan, carefully integrated and long maintained, makes definite provisions for the payment of specified sums over and above and beyond the wages or salary for work done, the plan and the payments under it should be treated as insurance since that is what it is in fact.

With much deference, I must, therefore, dissent.

# APPENDIX I

**Elements Of A Contract Of Insurance, 44 C.J.S., Insurance, § 226, p. 940**

**Provisions Of Plan In Instant Case Which Satisfy The Elements Of An Insurance Contract:**

**Subject Matter**

"The Southern Bell Telephone and Telegraph Company undertakes in accordance with these Regulations, to provide for the payment of definite amounts to its employees when they are disabled by accident or sickness or when they are retired from service, or, in the event of death, to their dependent relatives." (Pltf. Ex. 1, p. 5.)

**Risk Or Contingency Insured Against**

Loss of income because of employee's inability to work due to sickness. (Pltf. Ex. 1, p. 5, Sec. 1; p. 12.)

**The Duration Of The Risk Or Contingency**

Schedule, Pltf. Ex. 1, p. 6, Sec. 6, Para. 2:—

    from (a) 2 to 5 years of employment—full pay 4 weeks, half pay 9 weeks

    to (f) 25 years or more of employment—full pay 52 weeks.

Benefits begin on eighth calendar day of absence on account of disability. (Pltf. Ex. 1, p. 12, Sec. 6, Para. 3; also R/40.)

Benefits terminate when disability ceases, or period set out in Para. 2 ends. (Pltf. Ex. 1, p. 12, Sec. 6, Para. 1.)

**A Promise To Pay Or To Indemnify In A Fixed Or Ascertainable Amount**

Schedule of amounts set out in Sec. 6, Para. 2 of the Plan, page 12, Pltf. Ex. 1.

**A Premium**

Services rendered by the employee:—

Epmeier v. United States, 7 Cir., 199 F.2d 508:

"* * * service and labor rendered by plaintiff employee to employer was adequate consideration without payment of premium. * * *"

Herbkersman v. United States, D.C., 133 F.Supp. 495, at page 496:

"While no monetary consideration is paid by the employee for the protection afforded under the Plan, the acceptance of employment with the Plan being a feature thereof constitutes a full and adequate consideration; consideration need not necessarily be a transfer of money, it may be anything of value."

44 C.J.S., Insurance, § 349, p. 1323:

"While premiums are ordinarily payable in cash, the insurer may accept or authorize payment otherwise than in cash."

I. T. 4015, C.B., 1950–1, 23, at p. 25:

"The employees' rights to receive benefit payments under a voluntary plan in consideration of their employment and the employer's obligation to pay the benefits satisfy the requirements of contract. Furthermore, it seems clear that the contract is one of insurance, as a voluntary plan assures and promises each qualified employee a fixed compensation for a fixed period in the event accident or sick-

ness renders him unable to work. Such assurance is the basic function of an insurance contract. Therefore, such a plan also meets the requirements of Section 22(b) (5) of the Code."

| | |
|---|---|
| The Period Of Payment Of The Premium | Employee must work two years in order to be eligible for benefits. Pltf. Ex. 1, p. 12, Sec. 6, Para. 1; also R/22, 24. |
| An Agreement Of The Parties On All The Essential Elements | Plan is a part of employment contract between employer and employee. |

"Each employee on entering the service of the Company will be given a copy of this pamphlet. \* \* \* " (Pltf. Ex. 1, p. 4.)

The following chart shows some additional elements of insurance as set out in the case of Epmeier v. United States, 7 Cir., 199 F.2d 508:

| | |
|---|---|
| Additional Elements Of Insurance Discussed In Epmeier Case: | Under Plan In Instant Case: |
| A Shifting Of The Incident Of Risk From One To Another. | From employee to employer. Pltf. Ex. 1, p. 5, Sec. 1, Para. 1. |

Herbkersman v. United States, 133 F.Supp. 495, at page 496:

"Under the Plan the employer undertakes to assume the risk which would otherwise be borne by the employee of loss of income during periods of disability resulting from sickness, and the risk is thereby transferred from the employee to the employer and this transfer of risk creates in itself a contract of insurance."

| | |
|---|---|
| "Contractual" Security | Part of contract of employment. |

Epmeier v. United States, 7 Cir., 199 F.2d 508:

"But we know of no reason why insurance protection must be expressed in a formal contract."

"(4) As we have indicated, we know of no reason why this insurance, when provided as part of the contract of employment between employee and employer, must follow any stereotyped or conventional form. Surely there is no legal magic in form; the essence of the arrangement must determine its legal character. We conclude that the fact that there is no formal contract of insurance is immaterial, if it is clear, as here, that, for an adequate consideration, the company has agreed and has become liable to pay and has paid sickness benefits based upon a reasonable plan of protection of its employees."

44 C.J.S., Insurance, § 249, p. 1018:

"No particular form of words is required to constitute a contract of insurance."

**Medical Examination Prior To Employment** Not required here.

**Treatment By Physician During Disability** Pltf. Ex. 1, p. 19, Para. 11, 12:—

"(11) A disabled employee shall not be entitled to benefits if he declines to permit the Committee to make or have made by a physician, from time to time, such examination as the Committee may deem necessary in order to ascertain the employee's condition. * * * "

"(12) Disabled employees must take proper care of themselves and have proper treatment. Benefits will be discontinued to employees who refuse or neglect to follow the recommendations of the Committee."

Epmeier v. United States, 7 Cir., 199 F.2d 508:

(2) * * * "The employee is required while ill, to follow the instructions of his physician or the company's physician, a provision closely akin to features of ordinary insurance, where the insurer is interested in avoiding extension of any resulting loss beyond that which can be reasonably avoided."

**Contract May Be Revised** Pltf. Ex. 1, page 23, Sec. 10:

"The Committee, subject to the provisions of Section 9, with the consent of the President and subject to the approval of the Board of Directors, may from time to time make changes in the Plan set forth in these regulations, and the Company may terminate said Plan, but such changes or termination shall not affect the rights of any employee, without his consent, to any benefit or pension to which he may have previously become entitled hereunder."

Epmeier v. United States, 7 Cir., 199 F.2d 508:

(4) * * * "The provision that the terms of the agreement may be changed does not impinge upon the soundness of this conclusion. Employment contracts are always subject to revision. If the terms of such changes are not satisfactory to the employee, he may terminate his service; he can not be forced to work under conditions repugnant to his sense of what is fair and proper. It is obvious also, we think, that no change could be made to defeat or lessen the liability, once it had attached. In the provisions lies the implicit agreement to pay the benefits until and unless the terms should be modified; no such modification could reduce the liability for sickness benefits after illness had intervened."

44 C.J.S., Insurance, § 255, p. 1031:

"Contents" * * * "a contract of insurance is a voluntary one, and the parties thereto have a right to incorporate therein such provisions and conditions as they see fit to adopt, provided the conditions and provisions are not in violation of law or public policy."

# APPENDIX II

| | HAYNES<br>(Southern Bell Telephone & Telegraph Company Plan) | EPMEIER<br>(Lincoln National Life Insurance Co. Plan) | HERBKERSMAN<br>(American Telephone & Telegraph Company Plan) |
|---|---|---|---|
| 1. Plan stated in written document or booklet distributed to employees. | Yes. | Yes. | Yes. |
| 2. Employee consideration found in employment services rendered—no separate contribution by employees. | Yes. | Yes. | Yes. |
| 3. Duration of benefits based upon length of employment. | Yes. | Yes. | Yes. |
| 4. Amount of benefits (a) based upon salary (b) equivalent to full salary. | (a) Yes.<br>(b) Yes as applicable to Haynes—not determinable as applicable to all employees. | (a) Yes.<br>(b) Not determinable. | (a) Yes.<br>(b) Not determinable. |
| 5. Applicable to all regular employees who have passed a medical examination as an incident to employment. | Yes (medical examination not required.) | Yes. | Yes (does not appear in that employees take medical examination before hired). |
| 6. Benefits commence with first day of illness. | Generally on eighth day of illness, but first day in some cases; regular salary paid during first week and charged as sickness benefits on company records. | Inferable but not definitely determinable. | No payments made for first seven days of absence. |
| 7. Employee while ill required to follow instructions of his or company physician. | Yes. | Yes. | Inferably yes since confirmation of illness by own or company physician required. |
| 8. No benefits for illness or injury due to alcohol, immoralities, brawling. etc. | Not determinable. | Not determinable. | Not determinable. |
| 9. Administration of plan. | Committee of 5 appointed by directors from heads of operating departments approves payments. | Office Administration Department. Right to cancel if fullest cooperation not given. | Not determinable. |
| 10. Plan benefits and salary in single check. | Yes. | Not determinable. | Yes, if absence occurs in same pay period as regular pay. |
| 11. Costs of benefits not determinable | | | |

| | HAYNES (Southern Bell Telephone & Telegraph Company Plan) | EPMEIER (Lincoln National Life Insurance Co. Plan) | HERBKERSMAN (American Telephone & Telegraph Company Plan) |
|---|---|---|---|
| under actuarial tables, and no funded reserve. | Yes. | Not determinable. | ment for actual service. Not determinable. |
| 12. Plan subject to termination not to affect rights accrued prior thereto. | Yes. | Yes. | Yes. |