The **FIRST NATIONAL BANK OF BIRMINGHAM, ALABAMA,** and Sidney M. Smith, Executors of the Estate of Henry M. Smith, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 22075.

United States Court of Appeals Fifth Circuit.

March 29, 1966.

William M. Hames, Michael J. Egan, Jr., Atlanta, Ga., Sutherland, Asbill & Brennan, Atlanta, Ga., of counsel, for appellants.

Louis F. Oberdorfer, Asst. Atty. Gen., John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., Charles L. Goodson, U. S. Atty., Slaton Clemmons, Asst. U. S. Atty., Atlanta, Ga., Johnathan S. Cohen, David O. Walter, Norman H. Wolfe, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before BROWN and COLEMAN, Circuit Judges, and GARZA, District Judge.

COLEMAN, Circuit Judge:

The issue in this case is whether fifteen thousand dollars of the proceeds of an insurance policy were, for estate tax purposes, a part of the estate of Henry M. Smith, deceased. The District Court found in the affirmative. We disagree, and reverse.

We conclude that the appeal really involves no true question of estate tax law. The problem is encountered in the proper construction of certain contracts, as applied to an insurance policy of the decedent. Once this is settled there would be no difficulty in applying applicable estate tax statutes.

Henry M. Smith, a resident of Jefferson County, Alabama, died February 8, 1958. For many years prior to his death he was one of four stockholders, each owning an equal share, of the outstanding stock of an Alabama corporation, which we shall herein refer to as the Company.

On December 31, 1953, the four owners entered into a written contract providing essentially as follows:

(1). None of the stockholders could sell any of the common stock of the Company to any person without first offering to sell the same to the other stockholders. Each of the stockholders granted to the other stockholders "the option of purchasing the common stock in the Company respectively owned by him before any sale thereof shall be made to any person other than the said other stockholders". The option should be exercised within sixty days of offer, each stockholder having the right to purchase in proportion to stock already owned;

(2). In the event of the death of any of the stockholders, or resignation as an employee of the Company, the remaining stockholders were given the same option as described in (1);

(3). In the event any stockholder failed to exercise his option, then the remaining stockholders were given the right to purchase additional shares from the allotment which the declining stockholder would otherwise have been entitled to buy;

(4). Should all stockholders fail or decline to purchase stock within the option above described then the Company would succeed to the same option for an additional period of ten days, provided the Company purchased all the stock;

(5). The price of the stock was fixed at 1/400th of the total net value of the assets of the Company computed at market value on the date of an offer to sell, death, or voluntary termination of employment, the purchase price to be increased or decreased if, in the unanimous opinion of the option holders, substantial profit or loss was likely to result from pending contracts or undertakings;

(6). Stock purchases under the option were to be paid for in cash within ten days of the exercise of the option;

(7). Stockholders agreed not at any time to pledge, mortgage, or otherwise encumber such stock except for the benefit of the Company;

(8). Notice of these restrictions was to be stamped on the face of outstanding stock certificates;

(9). Offers and acceptances in the exercise of the options shall be in writing;

(10). If none of the options provided for in the contract were exercised then

the stock owner would be free to deal with it as he pleased;

(11). The provisions of the agreement were specifically made binding upon the respective personal representatives of the parties thereto.

On June 13, 1957, the same stockholders entered into another agreement in writing which recited:

"Each of the parties hereto carries life insurance under a group policy arrangement made with the National Association of Security Dealers. [Then followed the recitation that each of the individual stockholders by name had named the other three beneficiaries to the extent of $5,000 each]. It is understood and agreed that the said beneficiaries shall use the net proceeds of such insurance toward the purchase of the common stock [of the Company] owned by a decedent, his lawful heirs, or estate, in accordance with the terms of the contract of December 31, 1953".

The insurance policy in question, along with identical policies for the other three stockholders, had been obtained in January, 1957, but the second contract was not executed until June 13 of that year. Henry M. Smith died on February 8, 1958. The proceeds of the twenty thousand dollar policy were paid as follows: $5,000 to the Estate of Henry M. Smith, and a total of $15,000 to the three surviving stockholders.

On February 18, 1958, the surviving stockholders, by letter, advised the estate that they would purchase the stock as agreed upon in 1953 and as supplemented by the agreement of 1957. This letter stated that the surviving stockholders would deposit with the Estate the $15,000 proceeds they had received from the insurance policy, and such deposit was made on May 12, 1958.

On September 4, 1958, however, by mutual consent of the necessary parties, the deposits made by the stockholders were returned to them and the *Company* then purchased the stock owned by the estate of Henry M. Smith for cash in the sum of $41,072.47, being the value of the stock under the formula fixed in 1953. The Government does not contest this value.

On May 10, 1959, the executors of the estate filed an estate tax return for the estate of Henry M. Smith. In this return, the insurance proceeds, in the sum of $5,000 originally received and retained by the estate, were included in the gross estate, in addition to the $41,072.47 which had been received for the stock.

The Commissioner of Internal Revenue assessed a deficiency in the estate tax, asserting that the $15,000 face amount of life insurance proceeds should also have been included in decedent's gross estate. The estate paid additional tax in the amount of $4,308.12, interest in the sum of $692.13, for a total of $5,000.25.

Application for refund was denied and this suit for refund followed. The estate moved for judgment on the pleadings and the Government moved for summary judgment. The district court denied the motion for judgment on the pleadings, granted summary judgment for the Government, and dismissed the suit with prejudice at the cost of the estate. The case was heard altogether on documentary evidence, consisting of the contracts and the insurance policies. Neither side considered it advisable to aid the resolution of the controversy by the introduction of oral proof in further elaboration of intention of the parties, or on any other aspect of the case. In this status, construing contracts in the setting of the parties, our function does not involve fact finding as such, and consequently we are not confronted with the clearly erroneous or comparable concepts on reviewability.

As seen from an order of the district court dated June 17, 1964, the court considered the provisions of 26 U.S.C.A., Section 2031 defining a gross estate, 26 U.S.C.A., Section 2053 dealing with deductions from the gross estate "for claims against the estate", and 26 U.S.C.A., Section 2042, providing that the gross estate shall include insurance benefits on policies on the life of the decedent. The Court held that in the absence of evidence

on the subject it may be presumed that the policy was taken out in such circumstances as to make the value of it, at the date of the decedent's death, part of the decedent's estate for estate tax purposes. In an additional order dated July 17, 1964, the trial court construed the 1953 and 1957 contracts together and held that the $15,000 was includible in the gross estate on the theory that the 1957 agreement did not bind the parties to make the others beneficiaries in the insurance policy and did not bind them to buy the stock, deciding that both agreements *read together* still amounted to only an option.

As shown in its orders, the trial court gave considerable weight to what happened after the death of Henry M. Smith, pointing out that the stockholders first elected to exercise their option, then rescinded this action, and the corporation then exercised its option.

■ We begin our analysis of this situation on the principle that the critical time for determining the decedent's estate is at the moment of his death. Ithaca Trust Company v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647; United States v. Land, 5 Cir., 1962, 303 F.2d 170; 26 U.S.C.A., Section 2033.[1]

In *Land* this Court stated, "[b]rief as is the instant of death, the court must pinpoint its valuation at this instant— the moment of truth, when the ownership of the decedent ends and the ownership of the successors begins. It is a fallacy, therefore, to argue value before— or—after death on the notion that valuation must be determined by the value either of the interest that ceases or of the interest that begins. Instead, the valuation is determined by *the interest that passes,* and the value of the interest before or after death is pertinent only as it serves to indicate the value at death".

What was the situation existing and what were the obligations of the parties at the time of death, February 8, 1958?

The Government vigorously contends that the full proceeds of the policy were

includible in the gross estate because, by the terms of the policy, the right to change the beneficiary remained in decedent up to time of death, that there is not one word in the contracts to the effect that decedent or any other stockholder bound himself not to change the designated beneficiaries, and the surviving partners were not obligated to buy the stock of the decedent or to use the proceeds of the insurance policies in so doing.

Under the terms of Section 2042, Internal Revenue Code of 1954, and applicable treasury regulations on estate tax, the gross estate *does* include (1) amounts receivable by the executor of the decedent's estate under insurance policies on his life and (2) amounts receivable by other beneficiaries under such policies *if at his death he possessed any "incident of ownership in the policy".*

Applying these tests, the first immediately disappears because, so far as the policy was concerned, none of this fifteen thousand dollars was receivable by the Executor as a payment from the insurance company.

Applying the second, did Henry M. Smith possess any "incident of ownership in the policy"? As we read the applicable Alabama law, he did not.

■■ Alabama follows the rule that contracts dealing with insurance policies may be subject to construction according to the "intention of parties as determined from terms of assignment, subject-matter, and *course of dealing* (italics ours) to which it related. Where intention of parties to assignment of life policies is clear and contravenes no rule of law, and sufficient words are used to arrive at intention, assignment should be enforced irrespective of technical rules of construction". Taylor v. Southern Bank & Trust Co., 227 Ala. 565, 151 So. 357 (1933).

In Metcalf v. Montgomery, 229 Ala. 156, 155 So. 582 (1934), it was held that assignments of life insurance policies must be given the same construction and

---

1. "The value of the gross estate shall include the value of all property * * *
to the extent of the interest therein of the decedent at the time of his death."

effect as the parties themselves apparently gave to the assignment.

Since an assignment is simply one form of the many possible written contracts which parties may enter into with reference to insurance policies, these rules of construction should apply to all such contracts.

■ From the decision of the Supreme Court of Alabama in Williams v. Williams, 276 Ala. 43, 158 So.2d 901 (1963), it is clear that a policy owner by independent written contract or by independent agreement evidenced in writing may bind himself to change or not to change the beneficiary of an insurance policy. The Court said:

"[1] A contract of life insurance, being a chose in action, may, before loss, be assigned to one having an insurable interest in the life of the insured, without consent of the insurer, unless the policy has a stipulation to the contrary, or when not prohibited by law or public policy. Hamilton v. Hamilton, 255 Ala. 284, 51 So.2d 13; Missouri State Life Ins. Co. v. Robertson Banking Co., 223 Ala. 13, 134 So. 25.

"[2] An insured may assign a life insurance policy to a named beneficiary and thereby vest in him an irrevocable right to all its benefits. Hamilton v. Hamilton, supra; West End Savings Bank v. Goodwin, 223 Ala. 185, 135 So. 161.

"[3] The matter of change of beneficiary and assignment of policies are two separate and distinct things. An assignment is the transfer by one of his right or interest in property to another. The power to change the beneficiary is the power to appoint. Taylor v. Southern Bank & Trust Co., 227 Ala. 565, 151 So. 357.

"[4] An agreement by an insured, in consideration of the settlement of property rights by which he agrees to make his children the sole irrevocable beneficiaries of a policy of life insurance, vests them with an equitable interest therein which may not be defeated without their consent, and the insured cannot defeat the equitable right of a beneficiary by failing to act. He could not, in equity, be allowed to take advantage of his own wrong in breaching the property settlement and his estate is in no better position. Waxman v. Citizens Nat. Trust & Savings Bank of Los Angeles, 123 Cal.App.2d 145, 266 P.2d 48.

"[5] Here, the insured father had not only agreed to make his children the beneficiaries of the policy and keep it in force, but the agreement had been incorporated in the decree of the court and he had been ordered so to do.

"The legal consequence of the decree in the divorce suit was to give the children a vested equitable interest in the policy, and the subsequent change of beneficiary did not establish superior rights in the new beneficiary. In violation of the agreement and the decree, the insured wrongfully attempted to deprive his children of the proceeds of the policy by an attempted change of beneficiary. Equity will intervene and declare them the beneficiaries in the policy. Goodrich v. Massachusetts Mutual Life Ins. Co., 34 Tenn.App. 516, 240 S.W.2d 263".

This being settled law in Alabama and it being further settled that when such contracts require judicial construction it is to be accomplished in accordance with the intention of the parties and their course of dealings, we further find these authorities:

In Sellers v. Head, 261 Ala. 212, 73 So.2d 747 (1954), the Court reached a similar conclusion, using the following rationale:

"Where a contract fails to specify all the duties and obligations intended to be assumed, the law will imply an agreement to do those things that according to reason and justice the parties should do in order to carry out the purpose for which the contract was made. (Citations omitted.) Or as otherwise stated by Professor Willis-

ton, "There is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract * * *.'" (Quoting from 3 Williston, 3d ed. Sec. 670.) 73 So.2d at 751.

"What is implied in an express contract is as much a part of it as what is expressed". Perfection Mattress & Spring Co. v. Dupree, 216 Ala. 303, 113 So. 74; and Broyles v. Brown Engineering Co., 275 Ala. 35, 151 So.2d 767 (1963).

■ In the light of the applicable Alabama law, as above set forth, we are unable to agree with the legal conclusion of the district court that the contract of June 13, 1957, did not bindingly require the surviving partners to use the proceeds of the insurance to buy the stock of the decedent. Nor can we agree that the decedent legally retained the right to change the beneficiary of the policy. The language of the 1957 agreement, as we see it, is plain. It said that the "beneficiaries *shall* use the net proceeds of such insurance toward the purchase of the common stock owned by a decedent, his lawful heirs, or estate". If the parties used the proceeds to purchase the stock, they would inescapably be required to exercise the option. It is true that the 1957 agreement did proceed to say that the application of the proceeds toward the purchase of the common stock should be done in accordance with the terms of the 1953 agreement. This meant that the 1953 agreement would determine the value of the stock and the price to be paid therefor, as well as controlling the portion to be bought by each surviving stockholder. The 1957 agreement required that the insurance proceeds be used for the purchase of the stock. No other purpose was named or permitted. From reading the contracts in *pari materia* it is obvious that the stockholders wanted to be sure that if one of them died the survivors would have the funds with which to buy. No other idea or purpose is hinted. The ordinary experiences of life give room for the inference that each stockholder no doubt "thought" he would survive the others; but if he did not, then he wanted to be certain that his estate would promptly receive full value for the stock he owned. If he outlived the others, he wanted to be certain of the ready cash with which to buy the stock owned by deceased. Even if inartfully or scantily drafted, with consequent necessity for judicial construction, the intent of the parties seems clear.

The 1957 contract mandatorily committed the proceeds of the insurance. The only possible positive guarantee supporting that commitment would be the inability of the parties to defeat the agreement by changing the beneficiaries in the policies. The purpose of the contract, the specific purpose which the parties were arranging to achieve, would have immediately been defeated if any one of them could have changed the beneficiary in any one of the policies. We are thus inescapably driven to the conclusion that by these contracts all the parties, including the decedent, did contractually surrender the power to change the beneficiary, and this surrender was positively enforceable under Alabama law. Although as the Government says, this did not appear in the contracts in express language, the implication that the parties so agreed, tested by the Alabama rules of construction, leaves this as the truly logical construction. Since, at death, Henry M. Smith possessed no right to change the beneficiary and no right to direct the expenditure of the proceeds, that having been expressly dedicated to a particular purpose which neither he nor his Executor had the power to change, we must hold that he possessed no incident of ownership in the fifteen thousand dollars.

It is true that after Mr. Smith's death the surviving partners did pay the proceeds of the insurance policies to the estate in accordance with the 1957 agreement. We find no importance in the fact that by mutual agreement the corporation was later allowed to step in and buy the stock. Obviously the estate had the unconditional power to keep that which had

been paid to it. It was under no duty to do otherwise. Mr. Smith was dead. The value of his estate was to be determined as of death date. What the Executor later did with the stock, since the net result to the estate was the same, amounted to no more than any other transaction it might have seen fit to make in the handling of the property. The estate collected the full value of the stock (the controlling purpose, in event of death, in the contracts of 1953 and 1957), and the Government collected estate taxes in full on that value.

We accordingly find it unnecessary to elaborate upon the argument, so extensively debated in the briefs, that the contract of 1957 gave rise, or did not give rise, to a claim against the estate. Nor is it necessary to consider the contention of appellant that taxing the transfer of the entire value of the estate as well as the fifteen thousand dollars proceeds of the insurance policy would constitute double taxation.

We take notice that the policy contained the following provision: "All insurance and all benefits provided under the policy are non-negotiable and cannot be assigned, transferred, commuted, anticipated, or encumbered, and to the extent permitted by law are exempt from attachment and otherwise free from claims of creditors of the employee or beneficiary".

This limitation was solely for the benefit of the insurance company. It is of no influence in this case because the rights of the insurance company were not involved. Hamilton v. Hamilton, 255 Ala. 284, 51 So.2d 13 (1950).

Reversed, with directions to enter judgment for appellant.

JOHN R. BROWN, Circuit Judge (concurring):

I concur fully in the opinion and the result. I add this concurrence merely to focus professional attention on another effective use of the marvels of electronic machines in the vastly expanding business of litigation and its disposition.

On reading the briefs, and particularly those of the Government, one gained the vivid impression that this was a *cause celebre*. If not a frontal, it was at least a massive oblique assault on the conceptually unique *Tompkins-Mitchell* principle [2] on the estate taxation of life insurance proceeds in a survivor's buy-out arrangement.

Believing that Judges, like lawyers, O'Toole v. William J. Meyer Co., 5 Cir., 1957, 243 F.2d 765, 769 (dissenting opinion), ought to know what is going on before them, the question in our minds, was whether this was an isolated case of an isolated set of taxpayers in an isolated nonrepetitive setting, or was it one of those test cases so often tenderly coveted by tax counsel, private and government. This prompted an inquiry from the bench which counsel, quite understandably, could not then authoritatively answer. This precipitated the further court-suggestion that a check be made by machine search through the RIRA [3] computerized-record keeping and data retrieval equipment developed by the Internal Revenue Service and which has flowered under the enthusiastic cultivation of Chief Counsel Rogovin and his staff.

By post-submission memorandum, the Court has now been authoritatively advised that the question presented in this case, classified in this era of creeping numeralism as 2042.04–03 in the RIRA structure,[4] is the only one pending within

---

2. Estate of Mitchell v. Commissioner, 1938, 37 B.T.A. 1, acquiescence, 1939–1 Cum. Bull. 23; Estate of Tompkins v. Commissioner, 1949, 13 T.C. 1054, acquiescence, 1950–1 Cum.Bull. 5; Boston Safe Deposit & Trust Co. v. Commissioner, 1934, 30 B.T.A. 679; Dobrzensky v. Commissioner, 1936, 34 B.T.A. 305; Estate of Ealy v. Commissioner, 1951, 10 P-H Tax Ct. Mem. 431; Mertens, Federal Gift and Estate Taxation § 9.15; Private Ruling, 1948 Fed. Est. & Gift Tax Rep. par. 6012 (Nov. 24, 1947).

3. Reports & Information Retrieval Activity.

4. See RIRA: A Legal Information System in the Internal Revenue Service, * * * Taxes * * * (April 1965); Address by David T. Link, "Computer Use in Ad-

the Service, before the Tax Court or the District Courts.

The judicial importance of this information to us is best demonstrated by the Court's statement that "[w]e conclude that the appeal really involves no true question of estate tax law." 358 F.2d at 626. Our approach could then safely be that of an Alabama, not the so-called Federal, case.

The task of searching the tens of thousands of cases pending within the Internal Revenue Service and parallel court structures presenting an almost infinite number of legal issues would have been both impracticable and impossible but for the machine. The machine, suspect as it is for the supposed lack of judgmental capacity essential to adjudication, bears out again the hopes and predictions [5] now bearing fruit in a variety of ways [6] that it serves a useful, indeed perhaps indispensable, function in the judicial process as the world, and the people in the world, face the increasing complexities of an expanding social and economic structure.

ministration of Enforcement Activities," in ABA-ALI Joint Comm. on Continuing Legal Education, Law and Computers in the Mid-Sixties (1966); Address by R. P. Hertzog, Associate Chief Counsel, IRS, "Federal Tax Settlements and Litigation Policies," to be published in Journal of Taxation.

5. Brown, Electronic Brains and The Legal Mind: Computing the Data Computer's Collision with Law, 71 Yale L.J. 239 (1961).

6. See Louisville & Nashville R.R. v. Knox Homes Corp., 5 Cir., 1965, 343 F.2d 887, 896 n. 37; Transport Indem. Co. v. Seib, 1965, 178 Neb. 253, 132 N.W.2d 871; Bush v. Martin, S.D.Tex., 1966, 251 F. Supp. 484 n. 73; Bituminous Coal, Tennessee, Kentucky and Virginia to North Carolina, Tennessee and Virginia, 325 I.C.C. 548 (1965); Glass Bottles, Muskogee, Okla. to Chicago Group, 1964, 323 I.C.C. 258, 260-61; American Colloid Co. v. Akron, Canton & Youngstown R.R., 1963, 321 I.C.C. 91, 93; ICC Annual Report, 321 I.C.C. 238, 32 ICC Pract.J. 259, 272 (1965); Shinn, Computerization of Applicable Freight Rates, 33 ICC Prac.J. 141 (1965); McGrath, Computerization of Tariffs, 33 ICC Prac.J. 255 (1965); Fahl, Data Processing Applications in Collective Ratemaking, 32 ICC Prac.J. 572 (1965); Comment, Motor Transpor-

tation, 32 ICC Prac.J. 502 (1965), commenting on Burnham Van Service, Inc. Household Goods, From and To Thirteen States, 1965, 98 M.C.C. 58, T.I.M.E. Freight, Inc., Extension—Alternate Route —Memphis and Atlanta, 1962, 89 M.C.C. 241; Western Transp. Co., Extension— Vegetable Oil, 1965, 98 M.C.C. 86.

And see ICC Annual Report (79th, 1965), pp. 7, 12. All data-processing activities of the ICC are now centralized in the Managing Director's Office. The current study of ICC operations by Pennsylvania Research Associates, Inc., as a project of the Bureau of the Budget, in exploring "the potential of ADP techniques" has as its aim improvement in the decisional process. See also 33 ICC Prac.J. 515 (March 1966).

The computer's practical importance in the eyes of practical hard-working lawyers engaged in private practice is demonstrated by the number of seminar studies in depth under the sponsorship of the Joint Committee on Continuing Legal Education of the American Law Institute and the American Bar Association. The most recent are "The ALI-ABA Course of Study on Law and Computers in the Mid-Sixties" and "Course of Study on Cost-of-Service Rate Making in the Mid-Sixties" scheduled in Los Angeles March 31–April 2, 1966.