A. C. ROSS, District Director of Internal Revenue, Atlanta, Georgia, Appellant,

v.

Suzanne ODOM, Individually and as Executrix of the Estate of Benton Odom, Deceased, Appellee.

No. 24484.

United States Court of Appeals
Fifth Circuit.

Sept. 16, 1968.

465

Mitchell Rogovin, Asst. Atty. Gen., Richard C. Pugh, Acting Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Anthony Z. Roisman, Attys., Dept. of Justice, Washington, D. C., for appellant, Charles L. Goodson, U. S. Atty., Slaton Clemmons, Asst. U. S. Atty., of counsel.

William L. Kinzer, B. D. Murphy, Atlanta, Ga., for appellee, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., of counsel.

Before BROWN, Chief Judge, and FAHY * and DYER, Circuit Judges.

JOHN R. BROWN, Chief Judge:

When is a no contract a contract? That is the question. That, as is so frequent, this arises under the income tax structure is hardly any surprise. In more austere terms the question is whether the District Court was correct in holding that $27,450 received by Taxpayer as beneficiary of her husband's participation in the state-established Georgia Survivors' Benefit Program constituted proceeds of "a life insurance contract" under 26 U.S.C.A. § 101(a) (1) and were thus wholly tax exempt.[1] The Government, seeking reversal, contends that the proceeds were only a partially exempt employer-provided employee death benefit under 26 U.S.C.A. § 101(b) (1).[2] We affirm.

---

* Senior Circuit Judge of the D.C. Circuit, sitting by designation.

1. 26 U.S.C.A. § 101(a) provides: "(1) * * * [G]ross income does not include amounts received * * * under a life insurance contract, if such amounts are paid by reason of the death of the insured."

2. 26 U.S.C.A. § 101(b) provides: "(1) *General Rule.* Gross income does not include amounts received * * * by the beneficiaries or the es-

The facts are not complicated as tax cases go, were stipulated for the most part, and may be briefly stated. Robert Benton Odom died testate in 1961. His widow Suzanne is the duly authorized executrix of his estate and is the Taxpayer here. Robert had been employed by the State of Georgia since 1934 until his death. In 1953 the State of Georgia, by an amendment becoming an integral part of its intricate statutory structure for an annuity-pension program,[3] enacted a survivors' benefit program to provide for the payment of death benefits to beneficiaries designated by participants in the program. See Ga.Code Ann. § 40-2523.[4] In accordance with Rules and Regulations promulgated by the Board of Trustees of the Employees Retirement System of Georgia, §§ 40-2501(1) (2); 2506(1) (2); 2523(5), Robert qualified for the program and participated therein. Under it the State deducted ½ of 1% of his monthly pay as his contribution toward the program which it paid into the Survivors' Benefit Fund. § 40-2523(2). An equal amount, upon which Robert paid no income tax, was paid into this fund by the State of Georgia. At the time of his death, Robert's contributions totaled $662.33 with an equal sum paid by the State. Under the statutory structure survivor death benefits were to be paid out of this fund. The amounts payable to beneficiaries under the system were not funded or reinsured by any independent insurance company. Operation of the program bore, however, many similarities to insurance. The Board of Trustees under § 40-2523(1) was required to use an actuary in promulgating (and periodically reviewing) tables, rates, regulations, etc., as set forth in § 40-2509(2). And in 1959, after six years' experience with the program, the benefits payable to beneficiaries were increased because of the demonstrated success of the program and the adequacy of the actuarial computations.

Taxpayer does not contend that the benefits she received were a gift, but she did not report the survivors' benefit as income for 1961 since she contends that the payments constituted exempt proceeds under "a life insurance contract." The Internal Revenue Service determined that the proceeds were taxable as a non-life insurance employer-provided death benefit to the extent they exceeded $5,000 under § 101(b).[5]

■■ This case is one of first impression[6] and the precedents as to what

tate of an employee, if such amounts are paid by or on behalf of an employer and are paid by reason of the death of the employee.

"(2) * * * The aggregate amounts excludable under paragraph (1) with respect to the death of any employee shall not exceed $5,000."

3. The State in 1949 had enacted a retirement program for its employees. Ga. Code Ann. §§ 40-2501 to 40-2529. Robert participated in this program. Not to be confused with the survivors' death benefit here in controversy, Taxpayer has received periodic payments under the retirement program as the equivalent of a service retirement allowance on account of death. See § 40-2505(4) (c). These amounts have been reported as employee death benefits under § 101(b) for federal income tax purposes. This is not in dispute here.

4. Hereinafter all references to § 40-2501 et seq. will be to the Georgia Code Annotated Statutes.

5. The service allocated the $5,000 exemption of § 101(b) between the sums received under the retirement system (note 3 supra) and the survivors' system. Taxpayer does not question the allocation made by the IRS if the survivors' benefits were found to be taxable.

6. Following our frequent practice of the past, see First National Bank of Birmingham v. United States, 5 Cir., 1968, 358 F.2d 625, 631 (concurring opinion); United States v. Cocke, 5th Cir., 1968, 399 F.2d 433, 452 n. 27 (en banc), we requested the Government to have a RIRA Data Computer check (Reports & Information Retrieval Activity) to determine whether the issues are isolated and nonrecurring or whether other cases are testing the tax-

constitutes "amounts received under an insurance contract \* \* \* paid by reason of the death of the insured" are meager. Mertens, Federal Income Taxation § 7.03 (1962). But all cases which have had to discuss the problem are in agreement that for a monetary benefit paid to survivors to come within the purview of § 101(a) (1), the "insurance agreement need not be in the form of the standard life insurance contract." Mary Tighe, 1959, 33 T.C. 557, 564.[7] And, as the cases reflect, the arrangement need not even be in the form of a traditional bilateral agreement, or for that matter, even a unilateral one signed by one party and accepted by the other. Instead, for tax purposes the critical factors in determining when the payment of death benefits constitutes insurance have historically been the presence in a binding arrangement of risk-shifting and risk distribution. Helvering v. Le Gierse, 1941, 312 U.S. 531, 539, 61 S.Ct. 646, 85 L.Ed. 966, 999. This involves the payment of premiums or assessments by a number of individuals into a common fund out of which the payor's estate or beneficiaries will be paid a certain amount upon his death regardless of whether the amount is more or less than the decedent has paid into the fund." Mary Tighe, supra, 33 T.C. at 564.

The concept of risk-shifting and risk-distribution was further explained in Commissioner of Internal Revenue v. Treganowan, supra, 183 F.2d at 291: " 'Risk shifting emphasizes the individual aspect of insurance: the effecting of a contract between the insurer and the insured each of whom gamble on the time the latter will die. Risk distribution, on the other hand, emphasizes the broader, social aspect of insurance as a method of dispelling the danger of the potential loss by spreading its cost throughout the group. \* \* \*' Note, The New York Stock Exchange Gratuity Fund: Insurance That Isn't Insurance, 59 Yale L.J. 780, 784."

In light of these general principles that have been developed over the years in considering life insurance both under the present § 101 and its predecessor [8] and the estate tax provisions relating to insurance,[9] we fully approve the Trial Court's holding that the $27,450 received by taxpayer from the Georgia Survivors' Benefit Program constituted amounts received under a life insurance contract.

It is undisputed that Taypayer's deceased husband paid only $662.33 into the fund (equally matched by the State of Georgia) until the date of his death. At that same time, approximately 20,000

---

ability of benefits under Georgia's Retirement and Survivors' Benefit System as well as others. The Court was advised that this check revealed only two other cases pending at this time which deal with substantially the same issues as in the present case. Another District Court in Baldwin v. United States (M.D.Ga.) held for the taxpayer in a case identical to the present one on the authority of the District Judge's decision below. The Tax Court has pending the case of Alford J. and Marvelle D. Dempsey (T.C. No. 3866–66), involving the issue of the taxability of periodic death benefits under the Georgia Retirement Program and the Survivors' Benefit Fund in which the taxpayer is asserting that both retirement and survivors' benefits warrant § 101 (a) (1) exemption. See note 3 supra.

7. See also Commissioner of Internal Revenue v. Treganowan, 2 Cir., 1950, 183 F.

2d 288, cert. denied, 1950, 340 U.S. 853, 71 S.Ct. 82, 95 L.Ed. 625; Estate of Clarence L. Meyer, 1959, 32 T.C. 515.

8. Int.Rev.Code of 1939, § 22(b) (1) (A).

9. Int.Rev.Code of 1939, § 811(g) (1), now Int.Rev.Code of 1954, § 2042.
   § 2042. Proceeds of life insurance
   "The value of the gross estate shall include the value of all property—
   "(1) Receivable by the executor.—To the extent of the amount receivable by the executor as insurance under policies on the life of the decedent.
   "(2) Receivable by other beneficiaries.—To the extent of the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent with respect to which the decedent possessed \* \* \* incidents of ownership, \* \* \*."

other employees of the State of Georgia were also contributing an identical percentage of their monthly paycheck into the one common Survivors' Benefit fund out of which the prescribed benefits would be paid. Thus the risk-shifting requirement of an insurance arrangement was satisfied because the employee to the extent of the prescribed benefits had effectively shifted the economic risk that could arise from his untimely death from his survivors to the fund. Likewise, by the limited contributions made by him he in effect shifted to the fund the net proceeds of the benefits receivable which, for like family security, he would have had to accumulate by non-expended savings.[10]

Additionally, the plan into which Taxpayer's husband paid his monthly contribution met the risk distribution requirement historically imposed on any plan that aspired to be labeled life insurance. Over 20,000 persons employed by the State of Georgia were contributing to the single survivors' benefit fund each month, as was the State itself. Thus if the amount of contributions was actuarially adequate to pay the benefits of all participants, the risk of loss that was shifted to the fund was in turn distributed to a large number of persons. As the contributions were fixed at a statutory maximum of ½ of 1% of the employees' pay, § 40–2523(4) (a), and a like ceiling on that of the state, § 40–2523(4) (c), the unknown for computation were the benefits prescribed. As required by the statute, §§ 40–2509; 40–2523(1), these were fixed on accepted actuarial computations. And the testimony of an acknowledged actuarial expert associated with the actuarial consultants retained by the Board of Trustees under compulsion of the statute, § 40–2509(1), was uncontradicted that on accepted actuarial principles, the size and composition of the group, and relevant expectancy and investment factors, the benefits prescribed could be discharged by the Survivors' Benefit Fund. There was thus no if. On both scores this was insurance.

■ The Government makes a number of arguments in the hopes of overcoming, probably more accurately, of escaping from this undeniable risk shifting and risk distribution. Underlying all is a persistent theme that there must be a traditional "contract," a contract for insurance, and therefore necessarily executed by one qualified to write insurance as such. What that is, of course, is an insistence that in *form* there is nothing here resembling an insurance policy (contract). But form is ordinarily not controlling as the Government well knows from the success with which its appeals to substance over form meet. This case becomes a sharp reminder of the soundness of Judge Wisdom's declarations for us: "The principle of looking through form to substance is no schoolboy's rule; it is the corner stone of sound taxation * * * [for] '[T]ax law deals in economic realities, not legal abstractions * * *.' Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, 315, 76 S.Ct. 395, 399, 100 L.Ed. 347." But he went on to warn that "resort to substance is not a right reserved for the Commissioner's exclusive benefit to use or not to use—depending on the amount of the tax to be realized. The taxpayer too has a right to assert the priority of substance * * *." Weinert's Estate v. Commissioner of Internal Revenue, 5 Cir., 1961, 294 F.2d 750, 755.

■ One such argument is that the form is fatally deficient since there can be no true risk distribution unless the employees of the State, the insureds, pay the full amount of premiums necessary for the fund to meet obligations that it will incur. This argument is neither good economics nor good law. As the

---

10. The total payment to Taxpayer was $27,450, or 18 times Robert's monthly salary. This multiplier was fixed by the trustees of the fund pursuant to statutory authority after taking into account actuarial computations on experience and expectancy factors.

Supreme Court said in Haynes v. United States, 1957, 353 U.S. 81, 77 S.Ct. 649, 1 L.Ed.2d 671, "the payment of premiums in a fixed amount at regular intervals is not a necessary element of insurance * * * [and] there is no necessity for a definite fund to be set aside * * *." 353 U.S. at 84, 77 S.Ct. at 651, 1 L.Ed.2d at 674. Indeed, the facts of the *Haynes* case show that the employees paid no premiums whatsoever, yet the Court held that a contract between the employer and the employees to pay benefits during employees' illnesses constituted insurance.[11]

Perhaps even closer in point than *Haynes* is the decision in Commissioner of Internal Revenue v. Treganowan, supra. In that case, which dealt with the taxability of a death benefit paid to the beneficiaries of a member of the New York Stock Exchange by the "Trustees of the Gratuity Fund," the Government found it to its advantage to argue that the proceeds from the fund were insurance.[12] Greatly capsulating the facts of that case they show that the Exchange plan was designed to elicit fixed payments from surviving members of the Exchange every time a member died, thus providing funds for a death benefit payable to the deceased member's beneficiaries. But the Exchange also allocated one-half its profits over $10,000 to the fund. These two sums, along with excess payments and accumulated interest, made up the fund. In holding

that this plan constituted insurance, the Court had this to say:

"Here the risk of loss from premature death is effectively shifted from the individual to the group of other members of the Exchange. If the individual member dies prematurely, the amount paid to his kin will exceed the amount of assessments which he himself had paid in, the difference representing the loss caused by his premature death which the group has had to bear. Had he not been a member of the plan, he would have saved the amount of assessments against him before his death, but his beneficiaries would be $20,000 poorer. Thus they would have borne this loss which, through the Exchange plan, he has shifted to the group. And manifestly this plan provides a distribution of the risk, for because of the plan the risk of premature death is borne by the 1373 other members of the Exchange, rather than by the individual."

183 F.2d at 291.

One case which was not cited to us by either party (probably because of its relative obscurity) is about as close as one could ever hope to uncover either by hand or computer on the issue of whether the Georgia Survivors' Benefit Program constitutes insurance. In Benton L. Snyder Estate, 14 Tax Ct.Mem. 1067 (1945), the decedent had been a teacher in the New York school system and was thus required to participate in the retirement program. The money deducted

11. The Internal Revenue Code provision involved in *Haynes*, § 22(b) (5) of the 1939 Code, provided that "amounts received, through accident or health insurance * * * as compensation for personal injuries or sickness" were not taxable.

The Government through the Department of Justice of course disagrees heartily with our interpretation of *Haynes* as lending support to taxpayer's position. Whether this is an authoritative voice is doubtful since this contention surely seems to be in conflict with the Internal Revenue's position, reflected in Treas.Reg. § 1.101–1, which states that

"death benefits having the characteristics of life insurance proceeds payable by reason of death under * * * health insurance contracts, are covered by this provision." This regulation imports *Haynes* to say, in effect, that death benefits payable pursuant to a *Haynes* non-signed-non-insurance company contract is a "life insurance contract" under § 101(a).

12. Int.Rev.Code of 1939, § 811(g) (2), required the inclusion into the gross estate the "amount receivable * * * as insurance under policies on the life of the decedent." See note 9 supra.

from teachers' salaries wss used to pay retirement annuities and death benefits. Additional money was received from New York City to help fund the program. The death benefit equalled a stated percentage of salary multiplied by the length of service. The deceased's beneficiary received $21,715.50 as a death benefit and the Commissioner contended that this sum was not the proceeds of life insurance. The Tax Court said that "the courts of New York have held that payments of death benefits of this character are in the nature of life insurance. * * * This Court and the Court of Claims * * * have done the same. * * * [W]e hold that the item here in question was insurance * * *." 14 Tax Ct. Mem. at 1068.

Nothing we have said here is in any way inconsistent with the decision in Helvering v. Le Gierse, supra. There the Court was presented with a situation in which an uninsurable prospect purchased both a life insurance and a life annuity contract and paid the total premiums for each. Neither contract would have been issued without the other. The Court simply found that upon the death of the insured, any loss on one policy would be offset by a gain to the insurer on the other policy. Thus there was no "insurance risk" and the amounts received by the beneficiary were not insurance proceeds.

The Government's argument has even less standing as a matter of economics. The nature of insurance arrangements are almost infinite, reflecting generally the coalescence of four things. One is the existence of a risk either of occurrence, or time (or both). The second is the business need to underwrite risk of such loss. The third is the price to be charged for that protection. The fourth, a blend of all, the terms and conditions on which all or any given part of such loss is to be undertaken. (See discussion United States v. Haynes, 5 Cir. 1956, 233 F.2d 413, 416 (dissenting opinion), rev'd, 1957, 353 U.S. 81, 77 S.Ct. 649, 1 L.Ed.2d 671). Indeed, this record reveals as an uncontradicted *fact* that it is accepted insurance practice in industrial group life policies for the assured employees to pay only a portion of the premium cost with the balance contributed by the employer as a deductible expense to it but generally not taxable to the employees.[13]

Another attack by the Government on defects in form relates to conversion privileges on separation from employment, or on termination of the survivors' benefit program. And as an outgrowth of these two there is the related and only formidable assault based on the contention that risk shifting, risk distributing or not, the whole program was at the whim of the employer (State) who could terminate the program almost at will.

■ Conversion privileges on separation or plan termination offer no obstacle. In the first place, these are not essential ingredients in an insurance contract, ordinary, term, group or individual. These are but many of the infinite variables. Next, such conversion rights are very restrictive in time, mechanics and amount.[14] And so far as

---

13. The stipulation contained as Ex. F a copy of "Group Life Insurance Definition and Standard Provision Adopted by National Convention of Insurance Commissioners, December 1917" and as Ex. G, "National Association of Insurance Commissioners Model Bill, Group Life Insurance Definition, and Group Life Insurance Standard Provisions Adopted June 1, 1956." In Ex. F group life insurance is defined as a policy "issued to the employer, the premium on which is to be paid by the employer or by the employer and employees jointly * * *." In Ex. G the model Group Life Act requires that the issued policy prescribe that the " * * * premium * * * shall be paid by the policyholder, either wholly from the employer's funds or funds contributed by him, or partly from such funds and partly from funds contributed by the insured employees." I. (1) (b).

14. See, e. g., Ex. G, Model Act, note 13 supra, par. 8(a), (b), (c), allowing conversion within 31 days to other non-term, non-disability policy coverage for previous amount but payment of premiums at "customary rate applicable" to such converted insurance, not the former group rate.

termination or conversion on termination is concerned they are even more constricted. Contrary to the Government's assumption, the basic group policy between the employer as the assured policyholder and the company as the insurer is an annual, substantially a term, contract. Apart from collateral collective bargaining agreements or the like which might bind the employer to continue to afford group insurance, the employer-assured and the insurer are free to prescribe an annual or similar term. Moreover, such conversion rights are even more narrowly constricted than for separation.[15] Finally, although limited, there are in fact some conversion privileges under the Survivors' Benefit program.[16]

This brings us to the assertion we described as more formidable. As with the rest, the *form*idable turns out to be form not substance.

In effect what the Government here argues is that this is analogous to a private (not state) employer setting up its own self-insured program along these lines. The employer by employment contract or otherwise would set up a plan. The plan would state that the employer would each year set aside (either wholly from its own funds or by partial deductions from employees' pay) in a separate account (but still under employer control) that amount of money as would on accepted actuarial principles adequately fund the specified death benefits to all employees as a class. However, in addition to uncertainty of solvency, retention of funds, etc., the payment provision would expressly reserve to the employer the right to terminate the plan either generally or not to pay individual death benefit claims as due.

The argument is a good one—good in the sense of an appealing one—for if that is all the Georgia plan afforded we would hasten to allay the Government's fears that § 101(a) could work so well and cheaply, especially for insiders in closely held businesses.

But the Georgia program does not resemble this. To be sure, as in the traditional case of group insurance, the Board of Trustees of the Retirement System has the right to suspend the survivors' program for one year and unless revived within a year cause it to terminate altogether.[17] But the fact is that the right has not been exercised nor is there the slightest indication that it would be. More important the exercise of that right is narrowly constricted. It must affect all classes covered, that is for all state employees under it. And even then it may not "prejudice * * *

15. See Ex. G, Model Act, (note 13 supra) par. (9), which requires coverage for 5 years and the maximum amount is $2,000.00.

16. See Rules and Regulations par. (7) leave of absence; par. (8) after retirement.

17. § 40–2523(5):

"(b) A notice by the board of trustees through the department heads to the membership that the additional contributions provided for in this section will in the future be credited to the individual member's annuity savings account under conditions set forth in section 40–2511(1) (c) shall within itself suspend any and all survivors benefit coverage then in effect. Provided such action on the part of the board shall be applicable to all members alike simultaneously and without prejudice to

any survivors benefits pending in the case of a then deceased member.

"(c) Subsequent to any notice released under paragraph (b) of this subsection, any additional notice made in the same manner and within 12 months on the original notice to the effect that coverage is again available, shall re-establish survivors benefits to those formerly covered and to all new members that are otherwise eligible, except that within 30 days from the date of such notice any member may decline benefits under this section.

"(d) If within a period of 12 months after release of any notice provided for in paragraph (b) of this subsection the board of trustees has not released a subsequent notice under provisions of paragraph (c) of this subsection, then all provisions of this section shall be null and void and additional contributions provided for herein shall cease."

any survivors benefits pending in the case of a then deceased member" (note 17 supra). In other words the happening of the event—death of the covered employee—which triggers the payment of money which becomes the subject of controversy as to it being proceeds of an insurance contract, simultaneously seals the arrangement beyond repudiation or termination. At that point the designated beneficiary has both a vested claim, and a right to sue in an open forum.[18]

In many other ways the Georgia structure eliminates any such will-of-the-wisp. At the outset the Retirement System is administered by an independent Board of Trustees appointed by several sources but accountable to the people as a public body.[19] Investments are carefully restricted and, interestingly enough, the standards to be followed are those for Georgia life insurance companies.[20] Funds are severely protected by requiring either surety bond for individual treasurer or corporate trustee as treasurer, § 40–2510(2), and deposits in banks are both limited in amount and require deposit bonds. § 40–2510(3). All assets, and all benefit rights are exempt from all state and local taxes, execution, levy, attachment, etc. § 40–1512. And finally, continuation of the Survivors' Benefit Fund is assured through compulsory budgeting and payment by each employer-agency of the State, § 40–2501 (3), of the employer's contribution, §

18. 40–2052. "Establishment of system; management, power and privileges; names. —A retirement system is hereby established and placed under the management of the board of trustees for the purpose of providing retirement allowances and other benefits under the provisions of this Chapter for such employees of the State of Georgia and political subdivisions thereof as defined in section 40–2501, subsection (3). It shall have the power and privileges of a corporation, the right to sue and to be sued, and to implead and be impleaded, and shall be known as the 'Employees Retirement System of Georgia,' and by such name all of its business shall be transacted, all of its funds invested and all of its cash and securities and other property held. (Acts 1949, pp. 138, 142.)"

19. See Ga.Code Ann. § 40–2506:
"Board of trustees; organization and duties.—(1) The administration and responsibility for the proper operation of the retirement system and for making effective the provisions of this Chapter are hereby vested in the board of trustees, which shall be organized immediately after a majority of the trustees provided for in this section have qualified and taken the oath of office.
"(2) The board of trustees shall consist of seven members as follows:
The State Auditor, ex officio;
The State Insurance Commissioner, ex officio;
The State Merit System Director, ex officio;
One member appointed by the Governor for a term of four years * * *;

Two members elected by the above trustees for a term of four years * * *. These two members shall have had at least five years of creditable service with an agency included in this retirement system.
The seventh member shall be a citizen of this State, but not a member of the retirement system, nor who during the term of his office for which he is elected shall neither hold nor be a candidate for public office and who shall have had at least 10 years' experience in the investment of moneys and who shall be elected by the remaining trustees for a term of four years. * * * * * * * * * *
"(5) Each trustee shall, within 10 days after his appointment or election, take an oath of office that so far as it devolves upon him he will diligently and honestly administer the affairs of the board of trustees, and that he will not knowingly violate or willingly permit to be violated any of the provisions of law applicable to the retirement system. Such oath shall be subscribed to by the trustee making it and certified by the officer before whom it is taken, and shall be filed immediately in the office of the Secretary of State."

20. 40–2510. "Management of funds.—(1) The members of the board of trustees shall be the trustees of the retirement system, and shall have full power to invest and reinvest such assets, subject to all the terms, conditions, limitations and restrictions imposed by the laws of the State of Georgia upon domestic life insurance companies in the making and disposing of their investments * * *."

40–2511(6) and under the strong sanction of reduction of the agency's operating budget for failure to do so, the monthly remittance of the employees' contribution withheld from their pay. § 40–2516.

Thus this arrangement not only satisfies risk-shifting, risk-distributing, it does so in a binding enforceable way with death irretrievably liquidating a determinable obligation which can be paid in fact through ample funds collected, segregated, invested and husbanded under severe restrictions which assure both availability and sufficiency of the funds to discharge the obligation.

If that does not satisfy every element of a life insurance contract we are at a loss to identify the defect.

■ This leaves only a tag end. The Commissioner argues alternatively that if we hold the proceeds to be life insurance under § 101(a) (1), Taxpayer still cannot prevail because of the overlap between § 101(a) (1) and (b) (1) which arises since the proceeds can also be characterized as employee death benefits paid "by or on behalf of an employer." For this contention the Commissioner relies upon dicta in Essenfeld v. Commissioner of Internal Revenue, 2 Cir., 1962, 311 F.2d 208. In that case, after holding that life insurance was not present, the Court said that § 101(a) (1) is a general provision, § 101(b) (1) is a specific one, and the general must give way to the specific. We do not agree for four reasons. First, the legislative history of § 101(b) (1) plainly shows a legislative intent to liberalize exemptions under § 101, not restrict them.[21] Second, no reason appears to show why the proceeds from life insurance contracts, such as we have here, once found to fit within the statutory exemption of § 101 (a) (1), should be affected by a later provision clearly not intended to limit the effect of § 101(a) (1) in any way. Third, this argument is similar to the now-abandoned[22] and oft-rejected[23] contention made by the Commissioner that § 101(b) (1) was intended to limit the total exclusion provided in § 102 for widow benefits found to be gifts. Fourth, Congress intended to lessen hardship, not increase it, lose tax revenue, not gain it, by the addition of § 101(b) (1). We reject this contention by the Commissioner.

21. S.Rept.No. 781 (82 Cong., 1st Sess., p. 50) (1951) 2 U.S.Code Cong. & Admin. News, p. 2020:
"6. Death benefits to employees. Section 22(b) (1) of the code excludes from gross income amounts received under a life-insurance contract paid by reason of the death of the insured, whether in a single sum or otherwise. However, by its terms, this provision is limited to life-insurance payments, and the exclusion does not extend to death benefits paid by an employer by reason of the death of an employee. In order to correct this hardship, section 302 of your committee's bill excludes from gross income death benefits not in excess of $5,000 paid by any one employer with respect to any single employee's beneficiary or beneficiaries in accordance with a preexisting contract. The limitation of the exclusion to payments not in excess of $5,000 will prevent abuses under this new provision.
"This provision is effective with respect to taxable years beginning after December 31, 1950.

"The revenue loss from this amendment will be negligible."

22. See Rev.Rul. 62–102:
"The Internal Revenue Service will no longer contend that section 101(b) of the Internal Revenue Code of 1954 applies to limit to $5,000 the exclusion from gross income of an amount paid to the widow of a deceased employee, where the payment otherwise qualifies as a gift excludable under section 102 (a) of the Code. * * * The Service will continue to argue that, in extending section 101(b) of the Code to noncontractual payments, Congress assumed that such payments did not qualify as gifts, thereby endorsing the service's ruling in I.T. 4027, C.B. 1950–2 at 9, that widow's payments generally are not gifts."

23. Reed v. United States, W.D.Ky., 1959, 177 F.Supp. 205, aff'd per curiam, 6 Cir., 1960, 277 F.2d 456; Cowan v. United States, N.D.Ga., 1960, 191 F.Supp. 703.

Finally, the Commissioner argues that to hold that the proceeds here are not taxable would upset the symmetry in the tax law whereby employee benefits are either taxed to the employee when the benefit accrues or when the benefits are actually received. This argument ignores two things. First, there is no such symmetry. In 26 U.S.C.A. § 79(a) Congress has specifically excluded from taxation to the employee the employer's contributory cost of up to $50,000 of group term life insurance. At the same time, for such a policy issued by an insurance company, the proceeds would be exempt under § 101(a). Group life employer premiums get still another treatment when afforded through a qualified plan under 26 U.S.C.A. § 401(a); § 72(m) (3). Second, if "any inconsistencies exist, they are the product of a body of having the power to be not consistent. Whether * * * taxes should be laid * * * or exemption granted where death intervenes involves 'consideration of many complex, intricate, and sometimes technically significant factors which Congress, the weaver, evaluates as,' like Penelope, 'it weaves and unweaves the seamy web men call tax law.' United States v. Bond, 5 Cir., 1958, 258 F.2d 577, 584. If inconsistencies spoil the garment, the change is for Congress, not us." Byrd v. Commissioner of Internal Revenue, 5 Cir., 1957, 388 F.2d 223, 235.

Affirmed.

FAHY, Circuit Judge (dissenting):

I am of opinion that the history of the over-all problem, considered with the language and juxtaposition of the two provisions of the Internal Revenue Code of 1954 to be construed, show a congressional intent, which should control, that the payments to the widow in this case under the Georgia Survivor's Benefit Program are to be governed for federal income tax purposes by the provisions of Section 101(b) rather than of Section 101(a). For this reason I respectfully dissent.