Evelyn P. DAVIS, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. CA–68–28–CH.

United States District Court,
S. D. West Virginia,
Charleston Division.

Feb. 26, 1971.

John T. Kay, Jr., Kay, Casto & Chaney, Charleston, W. Va., for plaintiff.

Johnnie M. Walters, H. E. Marmoll, Dept. of Justice, Washington, D. C., and W. Warren Upton, U. S. Atty., Charleston, W. Va., for defendant.

## MEMORANDUM OPINION

FIELD, Chief Judge.

The question presented in this case is whether payments received by the plaintiff as the widow of a deceased judge from the West Virginia Judges' Retirement Fund are covered for federal income tax purposes by Sections 101(a) and 101(d) of the Internal Revenue Code of 1954, as plaintiff contends, or by Sections 101(b) and 72(b) as contended by the Government.

In 1949 the West Virginia Legislature established a retirement system for judges of any court of record in the State. West Virginia Code, Chapter 51, Article 9. The system is funded by a Judges' Retirement Fund consisting of mandatory contributions from participating judges; gifts and bequests or other accumulations paid into the Fund; together with specific appropriations from the State Legislature or any county court; and any other monies transferred to the Fund. W.Va.Code, 51–9–2.

A participating judge is required to contribute six percent of his salary (§ 51–9–4), although any judge may elect not to participate (§ 51–9–5). Eligible participating judges receive annual retirement benefits from the Fund equal to seventy-five percent of the highest annual salary of the office from which he retires. (§§ 51–9–6 and 51–9–6a.) In 1961 the West Virginia Legislature enlarged the benefits payable from the Retirement Fund to include annuities for widows of judges eligible for retirement benefits, as follows (§ 51–9–6b):

"There shall be paid, from the fund created by section two [§ 51–9–2] of this article, an annuity to the widow of a judge, who, at death, is eligible for, the retirement benefits provided by section six [§ 51–9–6] or six-a [§ 51–9–6a] of this article, and who dies, either while in office or after resignation or retirement from office pursuant to the provisions of this article: Provided, however, that any annuity accruing under this section shall be paid from, and only from, the fund, and the interest thereon, accumulated through the contributions of judges from whose salary deductions have been made, as herein provided, and no annuity accruing hereunder shall be paid from any public moneys contributed to the judges' retirement fund by the state of West Virginia.

"Said annuity shall amount to forty per cent of the annual salary of the office which said judge held at his death or from which he resigned or retired. In the event said salary is increased or decreased while an annuitant is receiving the benefits hereunder, her annuity shall amount to forty per cent of the new salary. The annuity granted hereunder shall accrue monthly and shall be due and payable in monthly installments on the first business day of the month following the month for which the annuity shall have accrued. Such annuity shall commence on the first day of the month in which said judge dies and terminate upon the death or remarriage of the annuitant."

Plaintiff is the widow of the late Judge Staige Davis, who was elected as Judge of the Common Pleas Court of Kanawha County for an eight-year term beginning January 1, 1948, and Judge Davis was over 65 when he began his term. On May 19, 1955, he started contributing six percent of his salary into the Judges' Retirement Fund. These contributions continued until his retirement at the end of his first term on

January 1, 1957, and totaled $833.35. For the next four years and ten months, until his death on October 31, 1961, Judge Davis received retirement benefits aggregating $23,291.84 from the Fund. Beginning on November 1, 1961, plaintiff started receiving benefits from the Fund pursuant to § 51–9–6b of the West Virginia Code, as set out above.

Plaintiff's benefits were paid at a rate of $366.67 per month until January 1, 1965, when they were increased to $500.00 per month. Through the calendar year 1965 the plaintiff had received a total of $19,933.34 from the Fund, the greater part of which she excluded from her federal income tax returns. The Internal Revenue Service made a determination that the payments were in the nature of employer-paid death benefits and were properly includable as taxable income to the plaintiff under Section 101(b) of the Internal Revenue Code of 1954. Pursuant to this determination $5,085.57 in income taxes and interest was assessed against the plaintiff for the years 1963, 1964 and 1965. Except for $8.27 in interest on the 1965 assessment, the plaintiff paid the assessment for each of the three years, and timely refund claims were filed by her which were disallowed. This action for the recovery of the taxes and interest so paid was timely filed and venue and jurisdiction under Section 1346(a) (1) of the Judicial Code are conceded by the Government.

It should be noted that the statute authorizing the widows' benefits [§ 51–9–6b] provides that any annuity accruing thereunder shall be paid only from that portion of the Fund resulting from the judges' contributions, and no widow's annuity shall be paid from any public monies contributed to the Retirement Fund by the State of West Virginia. This statutory restriction, however, has not been observed in the administration of the Fund. While the State Auditor, in his administration of the Retirement Fund, has maintained records reflecting judicial contributions, as well as legislative appropriations and earnings, the Fund has been treated as an integrated entity without any segregation or allocation with respect to the payments of benefits to judges or to widows. All benefits, whether retirement or annuities, are charged to the Fund as a whole. Additionally, it should be noted that all benefits are paid directly from this Fund and no portion thereof is underwritten by an independent source.

Plaintiff contends that payments she receives pursuant to § 51–9–6b of the West Virginia Code are in the nature of mutual life insurance proceeds and, therefore, are excludable from income as amounts paid by reason of the insured's death under Section 101(a) of the 1954 Internal Revenue Code, which provides:

"(1) General rule.—Except as otherwise provided in paragraph (2) and in subsection (d), gross income does not include amounts received (whether in a single sum or otherwise) under a life insurance contract, if such amounts are paid by reason of the death of the insured."

Defendant, on the other hand, contends that payments plaintiff receives pursuant to § 51–9–6b of the West Virginia Code are in the nature of employee death benefits, and, therefore, are only partially excludable under Section 101(b) of the 1954 Internal Revenue Code, which provides in part:

"(b) Employees' death benefits.—

"(1) General rule.—Gross income does not include amounts received (whether in a single sum or otherwise) by the beneficiaries or the estate of an employee, if such amounts are paid by or on behalf of an employer and are paid by reason of the death of the employee.

"(2) Special rules for paragraph (1).—

"(A) $5,000 limitation.—The aggregate amounts excludable under paragraph (1) with respect to the death of any employee shall not exceed $5,000."

The sole issue arising in this litigation is, therefore, whether or not pay-

ments made to judges' widows pursuant to § 51–9–6b of the West Virginia Code constitute payments made under a life insurance contract within the meaning of Section 101(a) of the Revenue Code. In order to qualify under this section it is only necessary that the death benefit payments have the "characteristics of life insurance proceeds." Treas.Reg. Section 1.101–1(a) (1). If, however, the payments do not qualify as insurance proceeds then they must fall into the category of employee death benefits as the Government contends.

As early as 1888 in Washington Central Bank v. Hume, 128 U.S. 195, 205, 9 S.Ct. 41, 44, 32 L.Ed. 370, life insurance was defined as " * * * simply a contract, so far as the company is concerned, to pay a certain sum of money upon the occurrence of an event which is sure at some time to happen, in consideration of the payment of the premiums as stipulated, * * *." Subsequently, in Helvering v. LeGierse, 312 U.S. 531, 539, 61 S.Ct. 646, 649, 85 L.Ed. 996 (1941), the Supreme Court stated: "Historically and commonly insurance involves risk-shifting and risk-distributing." Or, as the Court later held in S. E. C. v. Variable Annuity Co., 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) a contract that has no element of fixed return has no true risk in the insurance sense. Those three cases along with Essenfeld v. Commissioner, 311 F.2d 208 (2nd Cir. 1962), are the substance of the Government's defense.

In *Essenfeld*, the taxpayer's husband had entered into a ten-year employment agreement. The agreement provided for payment upon his death, while employed, to his widow, or children if his wife predeceased him, of $25,000 per year for two years, and provided for termination of the agreement on six months' incapacity, with payments of $25,000 per year in monthly installments for two years, any balance on his death to go to his widow or children. The agreement also provided a retirement allowance if he retired after completing the ten-year term. A life insurance policy on the employee's life was taken out by the employer in the amount of $75,000 with the employer named as beneficiary. Upon the death of the employee-husband, the employer received the $75,000 proceeds from the life insurance policy and paid to the taxpayer-widow $25,000 per year for two years. The taxpayer took the position that the amounts received by her were excludable, and the Commissioner made deficiency assessments which were sustained by the Tax Court of the United States. The Court of Appeals affirmed the decision of the Tax Court, holding that the agreement under which the payments were made was not a life insurance contract and that the payment fell squarely within the provisions of § 22(b) (1) (B) [the forerunner to Section 101(b) of the 1954 Code]. The Court succinctly stated its position (311 F.2d at 209):

"We reject petitioner's attempt to consider the death-benefit provision in a vacuum. By no stretch of accepted meaning can this ordinary type of employment arrangement, with all its other provisions for compensation, be called a 'life insurance contract' within the exclusion of § 22(b) (1) (A). Even looking at the particular provision alone, we find no resemblance to life insurance. Premium payments are not required, nor is there a shifting and spreading of the risk of death in any meaningful sense."

Plaintiff relies heavily on Ross v. Odom, 401 F.2d 464 (5th Cir. 1968) to refute the Government's argument. In *Ross* the taxpayer's husband had been employed by the State of Georgia from 1934 until his death in 1961. In 1953 Georgia had enacted a survivors' benefit program to provide for the payment of death benefits to beneficiaries designated by participants in the program. Taxpayer's husband qualified for the program under which the State deducted ½ of 1% of his monthly pay as his contribution to the Survivors' Benefit Fund. An equal amount was paid into the fund by the State of Georgia. Under the statutory scheme, survivor death bene-

fits were to be paid out of the fund. While the amounts payable to beneficiaries under the system were not funded or reinsured by any independent insurance company, the fund was actuarially sound with over 20,000 participants, and the benefit paid was fixed by the trustees after taking into account actuarial computations based on experience and expectancy factors. Furthermore, investments were restricted by the same standards which Georgia life insurance companies were required to follow, and upon the death of a covered employee the designated beneficiary had both a vested claim and a right to sue in an open forum. The Court held:

"* * * this arrangement not only satisfies risk-shifting, risk-distributing, it does so in a binding enforceable way with death irretrievably liquidating a determinable obligation which can be paid in fact through ample funds collected, segregated, invested and husbanded under severe restrictions which assure both availability and sufficiency of the funds to discharge the obligation."

To a large degree the facts and evidence herein were stipulated by counsel but, additionally, two witnesses testified at the trial of this case. They were Denzil Gainer, State Auditor of West Virginia, who has held that office since 1961, and Edward H. Friend, a qualified consulting actuary. Gainer testified that for many years there had been a serious question with respect to the actuarial and financial soundness of the Judges' Retirement Fund, and that in 1967 the Legislature appropriated $75,000 as a contribution to the Fund and an additional sum for the purpose of an actuarial study. This study was made by Mr. Friend's actuarial firm which made a report that in effect concluded that the Fund was "woefully deficient." Gainer was successful in obtaining an increase in the legislative appropriations for the Fund which brought the State's contribution up to a total of $150,000 for the fiscal year ending June 30, 1970 and $225,000 for the fiscal year ending June 30, 1971. Despite these increases the retirement system is still underfunded, and based upon relevant actuarial factors, it would presently require a minimum annual legislative appropriation in the amount of $450,000 to make the program actuarially sound.

The testimony of the witness Friend supported the statements and conclusions of Mr. Gainer, and clearly demonstrated that the West Virginia plan fails to meet the criteria to qualify as a life insurance arrangement comparable to that which was considered by the Court in the *Odom* case. On the contrary, the totality of the evidence would indicate that the situation in the present case is quite similar to that which confronted the Second Circuit in *Essenfeld*.

It is clear, of course, that under the West Virginia plan if there is no surviving widow then there is no death benefit payable to anyone. In addition to the patent lack of actuarial soundness of the Fund, this lack of a definitely determinable death benefit is fatal to the plaintiff's position in this case. Absent a definite benefit payable in any event upon the death of the employee, there is no shifting of risks, and, therefore, no insurance. As stated by the witness Friend, "I have never come across a program, a death insurance program, where a death insurance amount was not paid in the absence of a beneficiary."

In the light of the foregoing observations, it is my conclusion that the payments to the plaintiff from the Judges' Retirement Fund were not received by her under a life insurance contract which would make them excludable under Section 101(a) of the Internal Revenue Code. Accordingly, judgment should be entered for the defendant and counsel may prepare an appropriate order incorporating this memorandum opinion by reference therein.